United States Court of Appeals,

Eleventh Circuit.

No. 96-4577.

Shari L. LYES, Plaintiff-Appellant,

v.

CITY OF RIVIERA BEACH, FLORIDA, Cinthia Becton, et al., Defendants-Appellees.

Feb. 11, 1999.

Appeal from the United States District Court for the Southern District of Florida. (No. 95-8285-CIV-KLR), Kenneth L. Ryskamp, Judge.

Before TJOFLAT, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES, HULL and MARCUS, Circuit Judges, and KRAVITCH, Senior Circuit Judge.

CARNES, Circuit Judge:

We granted the defendant's petition for rehearing en banc in this employment discrimination case to decide two issues. The first is whether women are a protected class for 42 U.S.C. § 1985(3) purposes, so that a sex-based conspiracy against women is actionable under that provision. We hold that they are and it is. We also hold that Congress has the constitutional authority to prohibit such conspiracies, at least where they involve state action.

The second issue concerns the test applicable for deciding whether the employees of two employers are to be aggregated for determining if the minimum number of employees exist for Title VII coverage. We hold that the "single employer" aggregation test adapted from cases involving the NLRB, in which the employers are always private entities, is not applicable to those Title VII cases in which the employers are state and local government entities. For those cases we adopt a different test, one which presumes public entities that are separate under state law will not be aggregated for Title VII purposes. The plaintiff may rebut that presumption, however, by showing

either: 1) that the state's purpose for separating the entities under state law was to evade Title VII, or 2) that the entities are so closely related with respect to the fundamental aspects of employment relationships that the presumption in favor of the state law's denomination is clearly outweighed.

Applying that test to the public entity that employed the plaintiff in this case, we find there is not enough evidence of interrelatedness to allow a reasonable fact finder to conclude that the presumption in favor of the state's denomination of the entity as separate and distinct from any other state or local body is clearly outweighed.

## I. FACTS AND BACKGROUND

Because the factual and legal background of this case is more fully set forth in the panel opinion, *Lyes v. City of Riviera Beach, Florida,* 126 F.3d 1380 (11th Cir.1997), *vacated and reh'g en banc granted,* 136 F.3d 1295 (1998), we outline it only briefly here. The plaintiff, Shari Lyes, was hired by the City of Riviera Beach Community Redevelopment Agency (the "CRA") in 1989. Four years later, the position of Executive Director of the CRA became vacant. The CRA Board of Commissioners awarded the position to Neil Crilly, a male employee. When Lyes asked why she was not offered the position, she allegedly was told by a Board member that she was not qualified because of her sex. Lyes sued the City, the CRA, the members of the City Council, and Crilly, alleging that they had discriminated against her on the basis of her sex in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), Title VII, and Florida law.

The district court granted summary judgment for the defendants on all of the federal claims, and dismissed the state law claims without prejudice under 28 U.S.C. § 1367(c)(3). The judgment against Lyes on the federal claims was based on the district court's conclusions that: (1) Lyes' 42 U.S.C. § 1983 claims were foreclosed by our decision in *McKinney v. Pate,* 20 F.3d 1550 (11th Cir.1994); (2) women are not a protected class under 42 U.S.C. § 1985(3), therefore, sex-based

conspiracy claims are not actionable under that provision;  and (3) the CRA did not employ fifteen or more people itself as is required for Title VII coverage, and under the NLRA's single employer aggregation test the CRA and the City should not be aggregated.  Lyes appealed the district court's grant of summary judgment, and the panel reversed.

The panel held that Lyes' § 1983 claims were based at least in part on the Equal Protection Clause, not solely on the Due Process Clause as the district court had thought.  Accordingly, the panel remanded the § 1983 claims for reconsideration in light of equal protection principles.  *See Lyes,* 126 F.3d at 1387-89.  We adhere to the panel's reasoning and result on the § 1983 claim, and reinstate that portion of the panel opinion.

With regard to Lyes' § 1985(3) claim, the panel held that women are a protected class under that provision, so that sex-based conspiracies against them are actionable under it.  *See id.* at 1389-91.  We address that issue in Part II of this opinion.

As to the Title VII claim, the panel agreed with the district court that the single employer aggregation test developed in the NLRB context should be used to determine whether the CRA and the City are a single employer for Title VII jurisdictional purposes.  *See id.* at 1385-86.  However, the panel disagreed with the district court on the result of applying that test to the facts of this case and concluded there was a genuine issue of material fact as to whether the CRA and the City are a single employer.  *See id.* at 1386.  We discuss those issues in Part III of this opinion.

## II. WHETHER WOMEN ARE A PROTECTED CLASS UNDER 42 U.S.C. § 1985(3), SO THAT SEX-BASED CONSPIRACIES AGAINST THEM ARE ACTIONABLE UNDER THAT PROVISION

Lyes claims that the defendants' actions constituted a conspiracy to deprive her of equal protection of the laws in violation of 42 U.S.C. § 1985(3).  The district court granted summary judgment in favor of the defendants on that claim, because it believed that § 1985(3) prohibits only

those conspiracies motivated by racial animus and does not extend to those motivated by sex-based animus against women. We disagree, at least where, as in this case, the conspirators are acting under color of state law.

We begin our discussion by addressing the question of whether women are a "class of persons" within the meaning of § 1985(3). Because we conclude that they are, we then address the issue, raised in a dissenting opinion, about the source of Congress' authority to protect women from sex-based conspiracies against them by persons acting under color of state law.

With regard to the scope of § 1985(3), the language of the statutory provision is clear and broad. It unequivocally states that:

> If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, *any person or class of persons of the equal protection of the laws,* or of equal privileges and immunities under the laws. ., the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3) (emphasis added). The question, then, is whether women are "any class of persons" within the meaning of the statute.

Lyes argues that the textual similarity between the statute and the Equal Protection Clause of the Fourteenth Amendment, coupled with the fact that the statute was passed just three years after the Fourteenth Amendment was ratified, indicates Congress intended the scope of the statute to be coextensive with that of the Fourteenth Amendment, which prohibits sex-based classifications unless they "serve important governmental objectives and [are] substantially related to achievement of those objectives." *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976). We need not determine the outer limits of § 1985(3) coverage, nor the precise relationship between the statute and the Equal Protection Clause, in order to decide this case. For present purposes, all we need to decide is whether § 1985(3) protects women as a class of persons from sex-based

conspiracies against them where the conspirators were acting under color of state law. We conclude that it does, for the following reasons.

"In construing a statute we must begin, and often should end as well, with the language of the statute itself." *United States v. Steele,* 147 F.3d 1316, 1318 (11th Cir.1998) (en banc)(internal quotation and citation omitted). Here, the text of the statute indicates that women are a protected class within its domain, because the statute's prohibition of conspiracies against "any person or class of persons" certainly is broad enough to encompass women, and no other language in the statute excludes them from its coverage. As we noted in *Merritt v. Dillard,* 120 F.3d 1181, 1186 (11th Cir.1997), "the adjective "any' is not ambiguous; it has a well-established meaning." Quoting the Supreme Court's decision in *United States v. Gonzales,* 520 U.S. 1, 117 S.Ct. 1032, 1035, 137 L.Ed.2d 132 (1997), we said in *Merritt* that "the word "any' has an expansive meaning, that is, "one or some indiscriminately of whatever kind.'" *Merritt,* 120 F.3d at 1186. In this case, as in *Gonzales* and *Merritt,* "Congress did not add any language limiting the breadth of that word, so "any' means all." *Id.* at 1186 (quoting *Gonzales* )(internal citation omitted). Thus, women are within the plain meaning of "any ... class of persons," which describes the statutory scope of coverage.

Our enthusiasm for applying the plain meaning canon to § 1985(3) is tempered, however, by the Supreme Court's decisions in *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), and *United Brotherhood of Carpenters & Joiners v. Scott,* 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983). In *Griffin,* the Court glossed the statutory language with a caution against reading § 1985(3) so broadly (literally) as to turn it into "a general federal tort law" that would "apply to all tortious, conspiratorial interferences with the rights of others." 403 U.S. at 101-02, 91 S.Ct. at 1798. In order to avoid such a result, the *Griffin* Court held that the statute prohibits only those conspiracies motivated by "some racial, or *perhaps* otherwise class-based, invidiously

discriminatory animus...." *Id.* at 102, 91 S.Ct. at 1798 (emphasis added). The Court declined to elaborate on the "perhaps" qualifier, however, stating in a footnote that it "need not decide, given the facts of this case, whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable...." *Id.* at 102 n. 9, 91 S.Ct. at 1798 n. 9.

Consistent with the gloss it placed on the statutory language in *Griffin,* the Court held in *Scott* that § 1985(3) does not reach "conspiracies motivated by bias towards others on account of their *economic* views, status, or activities," 463 U.S. at 837, 103 S.Ct. at 3361, the "others" in that case being nonunion members. As it had in *Griffin,* the Court in *Scott* withheld judgment on whether § 1985(3) extends beyond "its central concern" of combating conspiracies driven by race-based animus. *See id.* at 837, 103 S.Ct. at 3360.

Thus, *Griffin* and *Scott* left open the issue we confront today, namely, whether a conspiracy motivated by sex-based animus against women is actionable under § 1985(3). It is clear to us, however, that if *Griffin*'s "perhaps otherwise class-based, invidiously discriminatory animus" means anything at all—and we think it does—it includes sex-based animus against women. Sex-based classifications receive heightened scrutiny under the Equal Protection Clause, *see Craig,* 429 U.S. at 197, 97 S.Ct. at 457, and discrimination based on sex frequently has been characterized as "invidious." *See, e.g., Frontiero v. Richardson,* 411 U.S. 677, 686-87, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973) ("[S]tatutory distinctions between the sexes often have the effect of invidiously relegating the entire class of females to inferior legal status without regard to the actual capabilities of its individual members."); *United States v. Chandler,* 996 F.2d 1073, 1083 (11th Cir.1993) ("Invidious factors, such as race or sex, cannot influence a jury's recommendation of the death penalty.").

Because the statutory language of § 1985(3) is unambiguous, ordinarily we would not

consult legislative history to discern its meaning. *See, e.g., United States v. Gonzales,* 520 U.S. 1, 117 S.Ct. 1032, 1035, 137 L.Ed.2d 132 (1997) ("Given the straightforward statutory command, there is no reason to resort to legislative history."); *Ratzlaf v. United States,* 510 U.S. 135, 147-48, 114 S.Ct. 655, 662, 126 L.Ed.2d 615 (1994) ("we do not resort to legislative history to cloud a statutory text that is clear"). In view of the Supreme Court's *Griffin* and *Scott* decisions, however, we think it prudent to note that the legislative history of § 1985(3) is not manifestly inconsistent with our holding. Although "[t]he legislative history of the Act confirms the conclusion that ... it was primarily motivated by the lawless conduct directed at the recently emancipated citizens," *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 319, 113 S.Ct. 753, 785, 122 L.Ed.2d 34 (1993) (Stevens, J., dissenting), it also reveals that at least some members of Congress believed actionable conspiracies would include those "against a person because he was a Democrat, ... or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter...." *Id.* at 296, 113 S.Ct. at 773 (Souter, J., concurring in part and dissenting in part) (discussing remarks of Senator Edmunds, who managed the bill on the Senate floor) (citations and quotations omitted). *See also Scott,* 463 U.S. at 837, 103 S.Ct. at 3360 (although the operative provision originated in a House bill, "Senator Edmunds' views, since he managed the bill on the floor of the Senate, are not without weight.").

Given prevailing attitudes at the time § 1985(3) was enacted, it is certainly possible, if not probable, that many legislators who voted for the statute were not concerned about affording legal protection to women as a class. Nonetheless, we follow the plain meaning of the statute, because "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998,

1002, 140 L.Ed.2d 201 (1998).

Any conclusion that women are not a protected class under § 1985(3) would run into a solid wall of contrary precedent. Relying primarily on the statutory language and the Supreme Court's statement in *Griffin,* the seven other circuits that have actually decided the issue are unanimous in their view that § 1985(3) applies to conspiracies motivated by sex-based animus against women. *See Libertad v. Welch,* 53 F.3d 428, 448-49 (1st Cir.1995) ("[I]t is logical that, at the very least, the classes protected by § 1985(3) must encompass those classifications that merit heightened scrutiny under Equal Protection Clause analysis, of which gender is one."); *National Org. For Women v. Operation Rescue,* 914 F.2d 582, 585 (4th Cir.1990) (collecting circuit cases), *rev'd in part, vacated in part on other grounds, Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993); *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1359 (2d Cir.1989) ("By its very language § 1985(3) is necessarily tied to evolving notions of equality and citizenship. As conspiracies directed against women are inherently invidious, and repugnant to the notion of equality of rights for all citizens, they are therefore encompassed under the Act."); *Volk v. Coler,* 845 F.2d 1422, 1434 (7th Cir.1988) ("[Section] 1985(3) extends beyond conspiracies to discriminate against persons based on race to conspiracies to discriminate against persons based on sex, religion, ethnicity or political loyalty."); *Life Ins. Co. of N. Am. v. Reichardt,* 591 F.2d 499, 505 (9th Cir.1979) ("[W]e conclude that women purchasers of disability insurance are a sufficient class [under § 1985(3) ]."); *Novotny v. Great Am. Fed. Sav. & Loan Assoc.,* 584 F.2d 1235, 1243 (3d Cir.1978) ("The fact that a person bears no responsibility for gender, combined with the pervasive discrimination practiced against women, and the emerging rejection of sexual stereotyping as incompatible with our ideals of equality convince us that whatever the outer boundaries of the concept, an animus against women includes the elements of a "class-based invidiously

discriminatory' motivation."), *vacated on other grounds,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); *Conroy v. Conroy,* 575 F.2d 175, 177 (8th Cir.1978) (concluding that the district court properly exercised jurisdiction where plaintiff had alleged a cause of action under § 1985(3) based in part on sex discrimination).

In addition to the holdings of the circuits we have set out above, one other circuit has said in dicta that sex-based animus is actionable under § 1985(3). *See Haverstick Enters., Inc. v. Financial Fed. Credit, Inc.,* 32 F.3d 989, 994 (6th Cir.1994). Only two circuits have indicated—and then only in dicta—that they would hold women do not constitute a protected class under § 1985(3). *See Deubert v. Gulf Fed. Sav. Bank,* 820 F.2d 754, 757 (5th Cir.1987); *Wilhelm v. Continental Title Co.,* 720 F.2d 1173, 1176 (10th Cir.1983).[1]

The grand tally is this. Of the circuits that have squarely confronted and decided the issue, seven have held that women are a protected class of persons under § 1985(3), and none have held that they are not. If both holdings and dicta are counted, eight of the circuits that have taken a position have said that women are a protected class under § 1985(3); only two have said that they are not.

Even though the views of individual Justices are not binding on us, *see, e.g., United States v. Stewart,* 65 F.3d 918, 924 (11th Cir.1995), it is appropriate in a case of first impression in this circuit to consider the views of those Justices who have expressed themselves on the issue. In *Bray,* Justices Souter, Stevens, and O'Connor all stated independently and unequivocally that they believe women are a protected class under § 1985(3). *See Bray,* 506 U.S. at 295-96, 113 S.Ct. at 769-75

---

[1]While the views of other circuits are not binding upon us in any event, we do accord them respect. But we give views espoused as mere dicta less respect than we give those that are forged as part of the holding in a case. *See McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1315 (11th Cir.1998) (Carnes, J., concurring) (explaining why conclusions stated as dicta are less reliable than those that are part of a holding in a case).

(Souter, J., concurring in the judgment in part and dissenting in part); *id.* at 322, 113 S.Ct. at 787 (Stevens, J., dissenting); *id.* at 350, 113 S.Ct. at 802 (O'Connor, J., dissenting). We add the views of those three Justices to the decisional mix and give them weight.

In addition, although the majority opinion in *Bray* does not explicitly hold that women are a protected class under § 1985(3), some of its analysis seems to suggest that they are. The issue in *Bray* was whether attempts to blockade abortion clinics to keep people from going inside constituted a conspiracy to deprive a person or a class of persons of equal protection of the laws in violation of § 1985(3). *See Bray,* 506 U.S. at 266, 113 S.Ct. at 757-58. The Court rejected "the claim that petitioners' opposition to abortion reflects an animus against women in general," and explained that "[w]e do not think that the "animus' requirement can be met only by maliciously motivated, as opposed to assertedly benign (though objectively invidious), discrimination against women. It does demand, however, at least a purpose that focuses upon women by reason of their sex...." *Bray,* at 269-70, 113 S.Ct. at 759. Although *Bray* did not hold § 1985(3) outlaws conspiracies driven by sex-based animus against women, language from the opinion at least hints that it does. We take the hint.

For all of the stated reasons, we conclude that women are a "class of persons" within the meaning of § 1985(3), and therefore are protected by that provision from conspiracies against them motivated by sex-based animus. We respond now to a point raised by Judge Tjoflat in his dissenting opinion.

Judge Tjoflat concedes that the Thirteenth Amendment provides Congress with a valid basis for enacting § 1985(3) insofar as that statutory provision involves race, but questions the constitutional foundation for the provision insofar as it involves sex. We need not answer that question as it applies to private actor conspiracies against women, because those are not the facts

of this case. This case involves alleged action under color of state law. All of the individual defendants are state or local officials, and it is undisputed that any action they took involving the plaintiff was action under color of state law. Thus, the only constitutional issue this case presents is whether Congress had a valid basis for proscribing conspiratorial discrimination against women by persons acting under color of state law.

Section 1985(3) does apply to conspiracies under color of state law, as well as private conspiracies. *See, e.g., Bray,* 506 U.S. at 268, 113 S.Ct. at 758 ("In *Griffin* this Court held, reversing a 20-year-old precedent, *see Collins v. Hardyman,* 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253 (1951), that § 1985(3) reaches not only conspiracies under color of state law, but also purely private conspiracies."). The Equal Protection Clause of the Fourteenth Amendment protects women from sex discrimination by persons acting under color of state law. *See Craig,* 429 U.S. at 197, 97 S.Ct. at 457. Moreover, section 5 of the Fourteenth Amendment empowers Congress "to enforce, by appropriate legislation, the provisions" of that amendment, including the Equal Protection Clause. We believe that Congress had ample authority under Section 5 of the Fourteenth Amendment to include women within the scope of § 1985(3)'s protection, at least where conspiracies to discriminate against them through action under color of state law are involved.[2]

---

[2]In his dissenting opinion, Judge Tjoflat flails away at two strawmen he has constructed. One he labels "the broad reading of the majority's holding" and describes as the application of § 1985(3) to all conspiracies to commit torts arising out of sex-based animus. That broad reading strawman goes beyond the facts of this case and our holding in it. This case does not involve all such conspiracies; it involves only conspiracies by state actors utilizing state action. As Judge Tjoflat himself concedes, § 1985(3) may be applied constitutionally to such a conspiracy. We leave for another day and case the issue of whether it may be applied constitutionally to other sex-based animus conspiracies.

Judge Tjoflat's dissenting opinion also attacks the "read more narrowly" strawman, which he characterizes as inserting a state action requirement into § 1985(3). We do not insert such a requirement into the statute. Instead, we simply recognize that where a conspiracy that is covered by the statute does involve state action, the issue of

For all of the reasons stated, we hold that sex-based conspiracies against women are actionable under § 1985(3), and that where the conspiracies involve state action, as the one alleged in this case did, Congress clearly had the constitutional authority to make them actionable. We reverse that portion of the district court's summary judgment that is to the contrary.

### III. WHETHER THE COMMUNITY REDEVELOPMENT AGENCY AND THE CITY SHOULD BE COUNTED TOGETHER AS AN "EMPLOYER" UNDER TITLE VII

A.

We turn now to the question whether the Community Redevelopment Agency (the "CRA") and the City should be aggregated and considered as a single "employer" under Title VII's definition of that term. Title VII defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person...." *See* 42 U.S.C. § 2000e(b). "Person" is defined as including "one or more individuals, governments, governmental agencies, political subdivisions, labor unions, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, or receivers." *See* 42 U.S.C. § 2000e(a). Because we have treated the question of whether a defendant meets the statutory definition of "employer" as a threshold jurisdictional matter under Title VII, *see Virgo v. Riviera Beach Associates, Ltd.,* 30 F.3d 1350, 1359 (11th Cir.1994),[3] a plaintiff must show that her "employer" had fifteen or more

---

whether Congress had authority to prohibit that conspiracy is an easy one. The conspiracy alleged in this case was motivated by sex-based animus, and such conspiracies fall within the scope of § 1985(3); the conspiracy also involved state action, so Congress clearly had the authority to prohibit it. We need not and do not go beyond those two holdings to decide this case.

[3]Some judges in other circuits have doubted whether the number of employees is a jurisdictional question. *See Sharpe v. Jefferson Distrib. Co.,* 148 F.3d 676, 677-78 (7th

employees for the requisite period provided under the statute before her Title VII claims can be reached.

It is undisputed that the CRA itself, during the relevant time, did not employ a sufficient number of individuals to fall within the statutory definition of "employer." It is also undisputed that if the CRA and the City are counted as one, collectively they employ enough people to meet that definition. Lyes argues that the two entities should be aggregated and treated as a single "employer" under Title VII, because the CRA and the City are interrelated in their operations and both entities exercised substantial control over her conditions of employment. By contrast, the CRA and the City contend that they are separate and distinct legal entities and should be treated as such, which would remove the CRA from Title VII's definition of "employer" and effectively deprive us of jurisdiction over that claim in this case. We must therefore decide what test applies in determining whether separate state or local governmental entities should be counted as a single "employer" for purposes of meeting the statutory definition under Title VII.

B.

We accord a liberal construction to the term "employer" under Title VII. *See Virgo,* 30 F.3d at 1359; *McKenzie v. Davenport-Harris Funeral Home,* 834 F.2d 930, 933 (11th Cir.1987); *Williams v. City of Montgomery,* 742 F.2d 586, 588 (11th Cir.1984). In keeping with this liberal construction, we sometimes look beyond the nominal independence of an entity and ask whether two or more ostensibly separate entities should be treated as a single, integrated enterprise when determining whether a plaintiff's "employer" comes within the coverage of Title VII.

Cir.1998) (Easterbrook, J.) (dicta) (*citing Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 118 S.Ct. 1003, 1009-12, 140 L.Ed.2d 210 (1998)); *EEOC v. St. Francis Xavier Parochial Sch.,* 117 F.3d 621, 624 (D.C.Cir.1997). The parties were not asked to brief this issue, and we will not take this occasion to re-examine our circuit precedent holding that counting employees is a jurisdictional matter.

We have identified three circumstances in which it is appropriate to aggregate multiple entities for the purposes of counting employees. First, where two ostensibly separate entities are " "highly integrated with respect to ownership and operations,' " we may count them together under Title VII. *McKenzie,* 834 F.2d at 933 (*quoting Fike v. Gold Kist, Inc.,* 514 F.Supp. 722, 726 (N.D.Ala.), *aff'd,* 664 F.2d 295 (11th Cir.1981)). This is the "single employer" or "integrated enterprise" test. Second, where two entities contract with each other for the performance of some task, and one company retains sufficient control over the terms and conditions of employment of the other company's employees, we may treat the entities as "joint employers" and aggregate them. *See Virgo,* 30 F.3d at 1359-60. This is the "joint employer" test. Third, where an employer delegates sufficient control of some traditional rights over employees to a third party, we may treat the third party as an agent of the employer and aggregate the two when counting employees. *See Williams,* 742 F.2d at 589. This is the "agency" test. *See generally* 2 Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 1309-17 (3rd ed.1996).

The issue before us involves the "single employer" test.[4] In determining whether two non-governmental entities should be consolidated and counted as a single employer, we have applied the standard promulgated in NLRA cases by the National Labor Relations Board. *See, e.g., McKenzie,* 834 F.2d at 933. This standard sets out four criteria for determining whether nominally separate entities should be treated as an integrated enterprise. Under the so-called "NLRB test," we look for "(1) interrelation of operations, (2) centralized control of labor relations, (3) common

---

[4]Lyes argued before the district court and the panel that the "agency" test might also be relevant in this case. Maybe, but some of the same factors discussed below that make the usual "single employer" test (the NLRB test) difficult to apply in cases involving related governmental entities may also make the usual agency test a poor fit where public entities are concerned. In any event, we do not decide any agency issues, because the panel did not reach them, *see* 126 F.3d at 1385 n. 6, and we limited our briefing request to the "single employer" issue.

management, and (4) common ownership or financial control." *Id.See also Radio and Television Broad. Technicians Local Union 1264 v. Broadcast Serv. of Mobile, Inc.,* 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965).[5]

The four-factor NLRB "single employer" test was first applied in the Title VII context in *Baker v. Stuart Broad. Co.,* 560 F.2d 389 (8th Cir.1977). Since that time, most of the circuits considering whether to integrate multiple entities under Title VII have seized upon that test. *See, e.g., Schweitzer v. Advanced Telemarketing Corp.,* 104 F.3d 761, 764 (5th Cir.1997); *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1241 (2d Cir.1995); *Childs v. Local 18, Int'l Bhd. of Elec. Workers,* 719 F.2d 1379, 1382 (9th Cir.1983); *Armbruster,* 711 F.2d at 1337-38 (6th Cir.). We, too, have applied the NLRB test. *See McKenzie,* 834 F.2d at 933. As one court employing the test noted, the similarity in language between the NLRA and Title VII, and the fact that statute served as a model for Title VII, makes decisions under the NLRA a useful resource for interpreting the language of Title VII. *See* 29 U.S.C. § 152(2); *Armbruster,* 711 F.2d at 1336 ("Since it is clear that the framers of Title VII used the NLRA as its model, ... we find the similarity in language of the Acts indicative of a willingness to allow the broad construction of the NLRA to provide guidance in the determination of whether, under Title VII, two companies should be deemed to have substantial identity and treated as a single employer.").

## C.

However useful the four-factor NLRB "single employer" test may be in Title VII cases where private entities are concerned, the question we face is the different one of whether that test

---

[5]Courts applying the NLRB "single employer" test to private entities in Title VII cases have held that not every factor need be present, and no single factor is controlling. *See, e.g., Armbruster v. Quinn,* 711 F.2d 1332, 1337-38 (6th Cir.1983); *Rivera v. Puerto Rican Home Attendants Servs., Inc.,* 922 F.Supp. 943, 949 (S.D.N.Y.1996). *See also Sakrete of N. Cal., Inc. v. NLRB,* 332 F.2d 902, 905 n. 4 (9th Cir.1964) (stating the same rule in an NLRB case).

should be applied where state and local governmental entities are concerned. In answering that question, we are aware of Congress's unmistakable intent that "Title VII principles be applied to governmental and private employers alike." *Dothard v. Rawlinson,* 433 U.S. 321, 331 n. 14, 97 S.Ct. 2720, 2728 n. 14, 53 L.Ed.2d 786 (1977). *See also Owens v. Rush,* 636 F.2d 283, 287 (10th Cir.1980) ("Governmental subdivisions were brought within the reach of Title VII" in the 1972 amendments to Title VII "so that "[a]ll state and local government employees would ... have access to the remedies available under the Act.' ") (quoting 1972 U.S.C.C.A.N. 2137, 2152).

But we are also aware of the unmistakable reality that in certain key respects, governmental entities are different from private ones. We will discuss some of those differences later. For now, it is worth noting that equal treatment consists not only of treating like things alike, but also of treating unlike things differently according to their differences. This is a proposition whose provenance stretches back to antiquity, *see, e.g.,* Aristotle, *The Nicomachean Ethics,* E.6.1131a-1131b (M. Ostwald trans.1962), and it has as much logical force now as it had in Aristotle's day. If we are to apply Title VII's principles equally to governmental and private employers in a fair and intelligible manner, we must apply those principles in a way that respects the differences between private and public entities. *See also Riley v. County of Pike,* 761 F.Supp. 74, 76 (C.D.Ill.1991) (applying the NLRB factors but noting that "[i]n addition to these factors, when the employers in question are government entities, additional criteria come into play.").

The four NLRB factors are useful for counting employees of *private* entities under Title VII, precisely because the test was "developed by the National Labor Relations Board to determine whether consolidation of separate *private* corporations is proper in determining the relevant employer" under the NLRA. *Owens,* 636 F.2d at 286 n. 2 (emphasis added). Of course, the NLRA does not cover public employers, *see* 29 U.S.C. § 152(2), and it is hardly surprising that a test

designed to operate in the context of private entities does not fit well cases involving governmental entities. States are not the equivalent of corporations or companies, and local government bodies are not the same as subsidiaries. With this in mind, we join those courts that have concluded that "the [four-part NLRB] standard is not readily applicable to governmental subdivisions[.]" *Trevino v. Celanese Corp.,* 701 F.2d 397, 404 n. 10 (5th Cir.1983); *Piper v. Junction City Hous. Auth.,* 1995 WL 88232, at *3 (D.Kan. Feb.1, 1995). *See also Massey v. Emergency Assistance, Inc.,* 724 F.2d 690, 692 (8th Cir.1984) (Lay, C.J., dissenting) ("I think it clear such test is not applicable to a factual situation concerning governmental entities.").[6] *But see Artis v. Francis Howell North Band Booster Ass'n, Inc.,* 161 F.3d 1178 (8th Cir.1998) (applying, without discussion, the NLRB test to a private entity and a government entity and deciding that they should not be combined); *Massey,* 724 F.2d at 690-91 (affirming, without discussion, the district court's application of the NLRB test to a government entity and the decision that it should not be aggregated with a private entity); *Vandermeer v. Douglas Cty.,* 15 F.Supp.2d 970, 974-75 (D.Nev.1998) (applying NLRB test to county and local fire and paramedic districts, but noting that "[t]he fact that Nevada may consider Douglas County and the Districts to be separate political subdivisions, while relevant, does not control."); *Rivera,* 922 F.Supp. at 949; *County of Pike,* 761 F.Supp. at 76-77 (applying NLRB test to Pike County and Pike County State's Attorney's office in ADEA case, but concluding that they should not be treated as an integrated enterprise).

The most obvious way in which the NLRB "single employer" test is incompatible with cases involving governmental entities involves the test's fourth factor—"common ownership or financial

---

[6]In *Dumas v. Town of Mt. Vernon, Ala.,* 612 F.2d 974, 980 n. 9 (5th Cir.1980), our predecessor court declined without explanation to apply the NLRB test in a governmental context. While we are not as sanguine as the panel about distinguishing *Dumas, see* 126 F.3d at 1385-86, unlike the panel we are not bound by a prior panel decision. We consider the matter anew.

control." *McKenzie,* 834 F.2d at 933. Governmental subdivisions such as counties or towns, or smaller subdivisions such as local agencies, may share sources of ultimate political control or funding, yet be wholly distinct with respect to their day-to-day operations or their control over relationships with employees. Thus, the "common ownership or financial control" factor of the NLRB test has no application to the usual case involving governmental subdivisions.

Nor is the NLRB test's third factor, "common management," *McKenzie,* 834 F.2d at 933, readily applicable in the case of governmental entities. While it may be an appropriate yardstick in some instances, in others two public entities may share managers or other employees while remaining politically separate and distinct. In the present case, for example, each member of the City Council also serves as a member of the CRA Board of Commissioners, but those city councillors in their different capacity as commissioners comprise, by law, a distinct and independent body. The Florida legislation that permits the members of a local governing body to declare themselves a community redevelopment agency, explicitly provides that "such members constitute the head of a legal entity, separate, distinct, and independent from the governing body of the county or municipality." Fla. Stat. Ann. § 163.357(b) (West 1990). So the common management factor, too, is not applicable in the context of governmental entities, at least not in a case like this one.[7]

In addition to the fact that these two prongs do not make sense in the context of state and local governmental entities, there is another, perhaps more fundamental reason for not applying the NLRB test. That reason involves federalism and comity concerns, which should play a significant role in determining whether to treat as one body two governmental entities that are separate and distinct under state law. When it comes to creating subordinate public bodies and defining their

---

[7]*See also Massey,* 724 F.2d at 692 (Lay, C.J., dissenting) (arguing that the "centralized control of labor relations" factor also is not relevant to an analysis involving local government entities).

relationship to one another and to itself, " "the state is supreme and its legislative body, conforming its action to the state Constitution, may do as it will.' " *City of Trenton v. State of New Jersey,* 262 U.S. 182, 186-87, 43 S.Ct. 534, 536, 67 L.Ed. 937 (1923) (quoting *Hunter v. Pittsburgh,* 207 U.S. 161, 178, 28 S.Ct. 40, 46, 52 L.Ed. 151 (1907)). Defining the nature and relationship of such bodies, no less than determining their level of funding, is "uniquely an exercise of state sovereignty." *DeKalb Cty. Sch. Dist. v. Schrenko,* 109 F.3d 680, 689 (11th Cir.) (quoting *Stanley v. Darlington Cty. Sch. Dist.,* 84 F.3d 707, 716 (4th Cir.1996)), *cert. denied,* 118 S.Ct. 601 (1997). We owe such determinations by the state legislature not only deference, but great deference.

In rejecting the four-factor NLRB test as a means of determining whether two or more governmental entities should be aggregated for the purposes of determining if they are an "employer" under Title VII, we do not mean to suggest that the two remaining prongs of the test, interrelation of operations and centralized control of labor relations, are not relevant to our inquiry in any way. But where state or local governmental entities are involved, any indicia of integration must be considered in a framework that is sensitive to the differences between governmental subdivisions and private entities. *See Trevino,* 701 F.2d at 404 n. 10.

D.

Given our conclusion that the traditional NLRB four-factor test is not readily applicable to the question of whether to aggregate state and local governmental entities for Title VII purposes, we must decide what standard or test should apply in its place.[8] Our inquiry must be guided by a combination of "respect [for] the way a state chooses to structure its government[,]" *McMillian v. Johnson,* 88 F.3d 1573, 1580-81 (11th Cir.1996), *aff'd,* 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d

---

[8]We are not required to decide in this case, and we express no view about, whether this or some different test should apply to aggregation issues involving federal governmental entities.

1 (1997) (*citing City of St. Louis v. Praprotnik,* 485 U.S. 112, 126, 108 S.Ct. 915, 925, 99 L.Ed.2d 107 (1988)), as well as recognition of our obligation to accord a liberal construction to the terms of Title VII. *See, e.g., Virgo,* 30 F.3d at 1359.

The strong comity and federalism concerns we have mentioned require that we accord substantial deference to a state lawmaking body's determination of whether two or more governmental entities are separate and distinct. We should not brush aside a state's own distinctions between its governmental subdivisions, because even ostensibly formal distinctions are part of a government's ability to shape its own institutions within constitutional bounds, and we are obligated to respect a state's right to do so. *See McMillian,* 88 F.3d at 1581 ("[W]e heed the Supreme Court's admonition that federal courts respect the way a state chooses to structure its government."). There are few things closer to the core of a state's political being and its sovereignty than the authority and right to define itself and its institutions in relation to each other. Of course, states cannot abuse that power to evade federal law, but it is unlikely that a state would structure its state and local entities with that purpose in mind. Such an evasive purpose is especially unlikely in a state like Florida, which has enacted its own anti-discrimination legislation and made it applicable to local governmental agencies. *See* Fla. Stat. Ann. § 760.02(6) (West 1997) (defining "person" under the Florida Civil Rights Act of 1992 to include "any governmental entity or agency.").

We think that where a state legislative body creates a public entity and declares it to be separate and distinct, that declaration should be entitled to a significant degree of deference, amounting to a presumption that the public entity is indeed separate and distinct for purposes of Title VII. The presumption may be rebutted in some instances. In particular, if it is established that a state's purpose in creating or maintaining nominally separate entities was to evade the reach of the federal employment discrimination laws, that alone is enough for those entities to be aggregated

when counting employees.

Even absent an intent to evade the application of federal law, we will aggregate two or more governmental entities and treat them as a single Title VII "employer" where other factors so plainly indicate integration that they clearly outweigh the presumption that the entities are distinct. In order to determine which factors should be considered in deciding whether the plaintiff has carried her burden of showing that the presumption has been clearly outweighed, we look to the factors courts have considered in Title VII cases involving private employers.

Despite the primacy of the NLRB test as applied to private employers under Title VII, "[c]ourts have used numerous formulations in assessing whether a defendant is an "employer' within the meaning of Title VII and other employment discrimination statutes." *Rivera,* 922 F.Supp. at 949. Our review of the different factors that have been considered convinces us that they all share a common focus: all of them seek to determine who (or which entity) is in control of the fundamental aspects of the employment relationship that gave rise to the claim. *See, e.g., id.* at 949 ("[The different tests] all have in common a focus on one factor at issue here: the amount of control or supervision a defendant exerts."); *Armbruster,* 711 F.2d at 1337 ("[C]ontrol over the elements of labor relations is a central concern" of the NLRB test); *Trevino,* 701 F.2d at 404 (centralized control of labor relations test "has been further refined to the point that [t]he critical question to be answered then is: What entity made the final decisions regarding employment matters related to the person claiming discrimination?") (internal quotation and citation omitted); *Chester v. Northwest Iowa Youth Emergency Servs. Ctr.,* 869 F.Supp. 700, 717-18 & n. 10 (N.D.Iowa 1994) (collecting cases and noting that "control of employment decisions and environment" is one of the central features of the tests).

Thus, two or more state or local governmental entities will be treated as a single "employer"

under Title VII where one entity exerts or shares control over the fundamental aspects of the employment relationships of another entity, to such a substantial extent that it clearly outweighs the presumption that the entities are distinct. Several factors will guide our determination of whether the presumption in favor of the distinctness of the public entities is clearly outweighed—or, at the summary judgment stage, whether a finder of fact could reasonably conclude that it is clearly outweighed. As we have already noted, the NLRB factors of "interrelation of operations" and "centralized control of labor operations," *McKenzie,* 834 F.2d at 933, may continue to be helpful in the inquiry. Useful "indicia of control" may be drawn from the agency context, including: " "the authority to hire, transfer, promote, discipline or discharge; the authority to establish work schedules or direct work assignments; [and] the obligation to pay or the duty to train the charging party.' " *Oaks v. City of Fairhope, Ala.,* 515 F.Supp. 1004, 1035 (S.D.Ala.1981) (quoting Barbara Schlei and Paul Grossmann, *Employment Discrimination Law* 846 (1st ed.1976)). Our list of factors is not intended to be all inclusive, and consideration must be given to the totality of the circumstances.

To summarize, we hold that when assessing whether multiple governmental entities are a single "employer" under Title VII, we begin with the presumption that governmental subdivisions denominated as separate and distinct under state law should not be aggregated for purposes of Title VII. That presumption may be rebutted by evidence establishing that a governmental entity was structured with the purpose of evading the reach of federal employment discrimination law. Absent an evasive purpose, the presumption against aggregating separate public entities will control the inquiry, unless it is clearly outweighed by factors manifestly indicating that the public entities are so closely interrelated with respect to control of the fundamental aspects of the employment relationship that they should be counted together under Title VII.

The standard we adopt is not whether a factfinder reasonably could conclude the plaintiff has overcome the presumption. Instead, the standard is whether the factfinder reasonably could conclude the plaintiff has *clearly* overcome the presumption. The adverb "clearly," which derives from the federalism concerns we have discussed, is meant to be limiting. It is a thumb on the scale, and sometimes it will be decisive because federalism concerns should sometimes be decisive. Absent evidence of evasive purpose, in order to survive a motion for summary judgment, a plaintiff will have to show that a reasonable fact finder could conclude that the presumption of distinctness is clearly outweighed.

E.

Applying this test to the present case, we conclude that Lyes has not adduced sufficient evidence to allow a reasonable fact finder to conclude that the City and the CRA should be treated as a single "employer," bringing them within the coverage of Title VII.[9] *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) (the court must ask "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict...."); *Raney v. Vinson Guard Serv., Inc.,* 120 F.3d 1192, 1198 (11th Cir.1997) ("[T]he plaintiff is effectively required to put forth her entire case at summary judgment [to] persuade the court that a reasonable fact finder could rule in the plaintiff's favor.") (internal

---

[9]In treating the question of whether the City and the CRA are a single Title VII "employer" as a question of fact, we follow the practice of this Court in analogous Title VII cases involving private employers. *See, e.g., McKenzie,* 834 F.2d at 933 ("Our role is to decide whether McKenzie presented sufficient evidence to create a genuine issue concerning whether Davenport-Harris and Protective should be treated as a single entity."). *See also Garcia v. Copenhaver, Bell & Assocs.,* 104 F.3d 1256, 1262-65 (11th Cir.1997) (drawing on Title VII cases to hold that "the question of whether or not a defendant is an "employer' is a substantive element of an ADEA claim and [is] intertwined with the question of jurisdiction. That being the case, the resolution of the question must be made by the fact finder deciding the merits of the claim.").

quotation and citation omitted).

Florida law establishes a presumption that the CRA and the City are separate and distinct bodies. As the district court noted, the State legislature created community redevelopment agencies as independent legal bodies. *See* Fla. Stat. Ann. § 163.356 *et seq.* (West 1990 & Supp.1999). With the exception of certain enumerated powers, they are granted "all the powers necessary or convenient to carry out and effectuate the purposes and provisions of [the community redevelopment agency legislation]...." Fla. Stat. Ann. § 163.358 (West 1990 & Supp.1999). The five City Council members also serve as the Board of Commissioners of the CRA. But Fla. Stat. § 163.357, which permits this arrangement, also states that "[t]he members of the governing body shall be the members of the agency, but such members constitute the head of a legal entity, separate, distinct, and independent from the governing body of the county or municipality." Fla. Stat. Ann. § 162.357(1)(b) (West 1990). *See also* 1991 Fla. Op. Att'y. Gen. 148 (No. 91-49, 1991). The clear distinction Florida law draws between the CRA and the City raises the presumption that they are separate and distinct entities.[10]

Looking at the nature of Lyes's employment relationship itself, we conclude that she has not produced evidence of interrelatedness with regard to control over employment sufficient to permit a reasonable fact finder to conclude that the presumption that the governmental entities are distinct is clearly outweighed. The CRA Board of Commissioners and its Executive Director control the fundamental aspects of employment of the CRA's staff. The Executive Director hires and supervises

---

[10]Moreover, these two entities are more than formally distinct. As the district court pointed out, the CRA maintains separate bank accounts and records, and files its own tax returns. It prepares its own budget and keeps its own offices. It is true that the City provides the majority of the CRA's funding, but we have already concluded here that the source of a governmental entity's funding is a poor indication of whether it should be aggregated with another; in any event, the CRA still receives close to one-third of its funds from a source other than the City.

the staff, and the Board may hire, fire, and establish work schedules and assignments. The Executive Director is employed by the CRA, and he serves at the pleasure of the CRA Board, not at the pleasure of the City. Employees of the CRA receive their medical benefits, life insurance and pension plans from the CRA, not from the City. Lyes was disciplined, suspended and eventually terminated by the Executive Director of the CRA, and that decision was upheld by the CRA Board, not by the City. All of these circumstances establish that the CRA retained and exercised control over the fundamental aspects of its employee relations.

The panel below cited some evidence in support of its conclusion that the CRA and City should be treated as a single employer. *See* 126 F.3d at 1386-87. Of that evidence, two matters deserve discussion. First, the panel pointed to a performance review of Lyes which was completed by the Executive Director on a City form, listing the CRA as a department of the City. The performance review was performed by Tony Smith, who was serving at the time as both City Manager and interim Executive Director of the CRA. Given his dual duties, we do not think the fact that he used City stationery has much, if any, significance. State law cannot be amended by inferences drawn from printed forms.

Second, the panel noted that Neil Crilly, the CRA Executive Director, sought review from the City's personnel director of his decision to discipline Lyes. We agree with the district court's conclusion that there was no indication that this review had any binding effect. Instead, it appears to have been an effort to seek the opinion of a third party as to whether Crilly had acted fairly in disciplining Lyes. In this sense, Crilly's action is not unlike seeking advice from an expert in employee relations.[11]

---

[11]In reaching its conclusion, the panel also relied heavily on the NLRB factors of common management and financial control. *See* 126 F.3d at 1387. We have already concluded, however, that these factors are not applicable to governmental entities.

Viewing the totality of the circumstances, we readily conclude that Lyes has not produced evidence sufficient to allow a reasonable fact finder to conclude that the presumption that the CRA and the City are separate entities is clearly outweighed and that they should therefore be treated as a single employer under Title VII.

## F.

Having decided the issues upon which we granted en banc review, we REMAND this case to the panel for further proceedings not inconsistent with this decision.

TJOFLAT, Circuit Judge, concurring in part and dissenting in part, in which BIRCH, Circuit Judge, joins:

This case requires us to interpret the scope of 42 U.S.C. § 1985(3). Two possible interpretations will sustain the majority's holding that the plaintiff in this case has a prima facie claim. One is that Section 1985(3) applies to all conspiracies involving sex-based discriminatory animus. The other is that it applies to conspiracies involving sex-based discriminatory animus in which the conspirators are state actors.[1] The former interpretation is unconstitutional; the latter interpretation is ridiculous. I therefore dissent.

## I.

The broad reading of the majority's holding is that any person injured by a conspiracy to

_____

[1]The majority avoids choosing between these two interpretations by holding that "sexbased conspiracies against women are actionable under § 1985(3), and that where the conspiracies involve state action ... Congress clearly had the constitutional authority to make them actionable." *Ante* at 1371. The majority thus reserves the question of whether all sex-based conspiracies against women are actionable under § 1985(3), or only those in which the conspirators are state actors. As I will demonstrate, however, neither interpretation can be sustained, and therefore the question reserved by the majority is nothing more than a choice between two erroneous statements of law.

commit a tort arising out of sex-based animus has a cause of action under section 1985(3).[2] Section 1985(3), as so interpreted, would be beyond Congress' power and thus unconstitutional.

The Supreme Court has warned us about "[t]he constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). A broad reading of the majority's holding founders on those shoals. Specifically, a rule that a conspiracy to commit a tort plus an injury plus sex-based animus equals a section 1985(3) violation opens the door to substantial federal intrusion into areas of law previously handled exclusively by state courts. For instance, every rape involving more than one perpetrator would create a federal cause of action—the underlying tort would be battery, and sex discrimination would be inherent in the conduct. Every domestic abuse case in which the abuser was somehow aided by a friend would be actionable under the statute. A gang of muggers who target women would also be amenable to suit under the statute. Indeed, even a group of schoolboys who taunt a female classmate during recess would be subject to suit under section 1985(3).[3]

---

[2]The statute creates a remedy for persons injured by a conspiracy to "depriv[e] ... any person or class of persons of the equal protection of the laws." 42 U.S.C. § 1985(3) (1994). The idea that an individual can deprive another individual of the equal protection of the laws is somewhat confusing. Our cases have made clear, however, that a person deprives another person of the equal protection of the laws by committing a tort—any tort—against that person. *See United States v. Harris,* 106 U.S. 629, 643, 1 S.Ct. 601, 612, 27 L.Ed. 290 (1883) ("The only way, therefore, in which one private person can deprive another of the equal protection of the laws is by the commission of some offense against the laws which protect the rights of persons, as by theft, burglary, arson, libel, assault, or murder."); *McLellan v. Mississippi Power & Light Co.,* 545 F.2d 919, 925 (5th Cir.1977) (en banc).

[3]I realize that if, under these factual scenarios, females were replaced with African Americans, there would be no question that section 1985(3) would provide the victims with a cause of action. As I demonstrate *infra,* however, there is a constitutional basis for applying section 1985(3) in cases of racial animus (the Thirteenth Amendment), while no such basis exists for extending the statute to cases of sex-based animus.

The greatest potential intrusion, however, would be in the area of workplace discrimination and sexual harassment. The federal courts are already involved in these areas through Title VII. The reach of Title VII, however, is limited in a variety of ways—for instance, it creates liability only for "employers" as defined under the statute, *see* 42 U.S.C. § 2000e(b) (1994), and requires an aggrieved party to file a complaint with the EEOC, *see* 42 U.S.C. § 2000e-5 (1994). The majority's holding effectively casts aside these limitations.[4] Every employee who is fired because of her sex, assuming that more than one person was involved in the firing decision, would have a federal cause of action. Male employees who touch women inappropriately—and any superiors who know about it and do nothing—could be held jointly and severally liable if they acted in concert. Every group of men that makes vulgar comments to women could be taken to federal court.[5]

This federal usurpation of state sovereignty implicates the core constitutional idea of federalism. Under our constitutional system, the federal government is a government of limited powers, and all powers not given to the federal government are reserved to the states. *See* U.S. Const. amend. X. Federalism requires that any law enacted by the federal government must be grounded in a specific grant of power under the Constitution.

It is clear that section 1985(3) was enacted, at least in part, under Congress' authority to eliminate the "badges and incidents" of slavery pursuant to section 2 of the Thirteenth Amendment. *See* U.S. Const. amend. XIII, § 2; *Griffin,* 403 U.S. at 104-05, 91 S.Ct. at 1799; *see also Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 437-44, 88 S.Ct. 2186, 2202-05, 20 L.Ed.2d 1189 (1968)

---

[4]The potential use of section 1985(3) to get around the limitations of Title VII was explicitly criticized in *Great American Federal Savings & Loan Ass'n v. Novotny,* 442 U.S. 366, 375-76, 99 S.Ct. 2345, 2350-51, 60 L.Ed.2d 957 (1979).

[5]The underlying torts in these three examples are, respectively, wrongful termination, battery, and intentional infliction of emotional distress.

(describing Congress' Thirteenth Amendment powers). Congress' authority under the Thirteenth Amendment is limited, however, to the prevention of discrimination on the basis of race. Thus, if we are to interpret section 1985(3) as preventing sex discrimination, we must find some other constitutional grounding.

One possibility is to base 1985(3) on Congress' power under section 5 of the Fourteenth Amendment to enforce that amendment's guarantee of equal protection.[6] *See* U.S. Const. amend. XIV, §§ 1, 5. The Equal Protection Clause, however, is a guarantee of protection against unjust *state* action; it does not reach the conduct of private individuals. Section 1985(3), under a broad reading of the majority's holding, would reach all individuals regardless of whether they are private or public actors. Thus, section 1985(3), read broadly, cannot be grounded in Congress' power under section 5 of the Fourteenth Amendment.[7]

The other usual suspect for legislation of this sort is the Commerce Clause. *See* U.S. Const. art. I, § 8. There are, however, at least four good reasons why section 1985(3) cannot be grounded in Congress' power to regulate interstate commerce. First, there is nothing in the legislative history of section 1985(3) to suggest that Congress was acting pursuant to that power. Second, there is nothing in the statute itself that ties it to the Commerce Clause—it does not, for instance, create a cause of action for only those conspiracies that affect interstate commerce. Third, it is hard to

---

[6]In *Griffin,* the Supreme Court explicitly avoided the question of whether section 1985(3) was within Congress' power under section 5 of the Fourteenth Amendment. *See Griffin,* 403 U.S. at 107, 91 S.Ct. at 1801.

[7]The only way in which section 1985(3), read broadly, could be understood as being based on Congress' section 5 powers is if Congress had concluded that state deprivations of equal protection were so rampant that, as an extreme prophylactic measure, it needed to pass a statute sweeping broadly enough to reach private individuals involved in any tortious behavior. The majority makes no showing—and I seriously doubt that it could make a showing—that this was the case.

imagine how private tortious behavior of the sort that section 1985(3) prohibits (under a broad reading of the majority's holding) could—at least in most cases—reasonably be said to involve "Commerce ... among the several States." U.S. Const. art. I, § 8; *see also United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). Finally, the Supreme Court has already unequivocally stated that section 1985(3) is not grounded in the Commerce Clause. *See United Brotherhood of Carpenters and Joiners of Am. v. Scott,* 463 U.S. 825, 833, 103 S.Ct. 3352, 3358, 77 L.Ed.2d 1049 (1983).

No other constitutional provisions appear to be colorable candidates. Thus, I am forced to conclude that Congress does not have the authority to create a remedy for all persons harmed by conspiratorial tortious conduct arising from sex-based animus.[8] Consequently, section 1985(3), insofar as it is interpreted to create such a remedy, is unconstitutional.

II.

The majority's holding may be read more narrowly to mean that section 1985(3), at least when applied to cases involving sex-based discriminatory animus, covers only those conspiracies in which the conspirators are state actors. Such a reading of the statute brings it within Congress' Fourteenth Amendment powers and thus avoids the constitutional problems outlined in the previous section. However, it also reads a state action requirement into section 1985(3), thereby contravening nearly every imaginable canon of statutory interpretation.[9]

---

[8]As the majority points out, *see ante* at 1368 - 69, a number of other circuits have interpreted section 1985(3) as providing a remedy in federal court for conspiracies arising out of a sex-based animus. None of these circuits, however, has explained whence Congress derives the authority to create such a remedy.

[9]Indeed, such a reading of section 1985(3) would be so far removed from true statutory interpretation as to be nothing more than pure judicial activism, and consequently a violation of the constitutional doctrine of separation of powers.

The plain language of the statute says absolutely nothing about a state action requirement.[10] The statute does not use the terms "state actors," "persons acting under color of state law," or any other language that would suggest that section 1985(3) applies only to agents of the state. Instead, the statute applies to conspiracies involving "persons," without qualification.[11] Turning to the legislative history, the statements of various representatives and senators regarding the enactment of section 1985(3) clearly indicate that the statute's reach was in no way intended to be limited to state action—on the contrary, their statements make clear that they deliberately chose to target "individuals" (regardless of governmental affiliation) in contrast to states. *See Griffin,* 403 U.S. at 99-101, 91 S.Ct. at 1797-98.

Most importantly, the Supreme Court precedent interpreting section 1985(3) unequivocally forecloses any attempt to read a state action requirement into the statute. In the words of that Court, "all indicators—text, companion provisions, and legislative history—point unwaveringly to §

---

[10]Of course, the plain language of the statute also says nothing about discriminatory animus; nevertheless, the Supreme Court has read a discriminatory animus requirement into the statute. *See Griffin,* 403 U.S. at 102, 91 S.Ct. at 1798 (holding that proof of a violation of section 1985(3) requires a showing of "racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action"). This limitation on section 1985(3)—like the state action limitation that the majority suggests—was based on a need to keep the statute within Congress' constitutional authority. *See id.* at 101-02, 91 S.Ct. at 1798. The discriminatory animus requirement, however, was well grounded in section 1985(3)'s legislative history. In contrast, as I will discuss in this section, the majority's state action requirement is in direct conflict with the statute's legislative history and the dictates of the Supreme Court.

[11]The statutory language argument is made even more powerful when § 1985(3) is viewed in its original context. Section 1985(3) was enacted as § 2 of the Civil Rights Act of 1871, 17 Stat. 13. Section 1 of that Act—now codified as 42 U.S.C. § 1983—explicitly requires that the alleged deprivation of constitutional rights be "under color of state law." Not only does this indicate that Congress was perfectly capable of including a state action requirement if it so desired, but it also suggests a statutory scheme in which § 1 (now § 1983) was aimed at state action while § 2 (now § 1985(3)) was aimed primarily at private conduct. Under such a scheme, reading a state action requirement into section 1985(3) would radically undermine congressional intent.

1985(3)'s coverage of private conspiracies." *Griffin,* 403 U.S. at 101, 91 S.Ct. at 1798; *see also*

*Scott,* 463 U.S. at 834, 103 S.Ct. at 3359 ("[T]he *Griffin* opinion emphatically declared that [section

1985(3) ] was intended to reach private conspiracies that in no way involved the state."). It would

be hard to imagine a more unequivocal statement that a plaintiff alleging a violation of section

1985(3) need not allege state action.[12]

   In sum, imposing a state action requirement on section 1985(3) is absurd.[13] It is abundantly

clear that the presence or absence of state action is completely irrelevant to the existence of a claim

under section 1985(3). It may be true that Congress has the power, pursuant to section 5 of the

Fourteenth Amendment, to pass a statute providing a remedy for women injured as a result of a

conspiracy to commit a tort arising out of sex-based animus where the conspirators are state actors.

Section 1985(3) is not that statute. Therefore, the fact that the defendants in this case are state actors

provides no basis for a section 1985(3) claim by the plaintiff.[14]

---

   [12]The majority opinion is notably bereft of precedent for the proposition that state action has any relevance in a section 1985(3) claim—because, at least after *Griffin,* there is no such precedent to be found.

   [13]I also note the patent inconsistency of reading a single statute as requiring state action in one situation (sex discrimination) but not another (race discrimination). Such a reading in essence converts section 1985(3) into two statutes—one for race-based animus that applies to all persons, and one for sex-based animus that applies only to state actors.

   [14]The majority steadfastly resists the idea that it might be reading a state action requirement into section 1985(3). *See ante* at 1370 n. 2. This resistance results from a failure by the majority to consider the consequences of its reasoning. The majority's reasoning seems to operate as follows: Section 1985(3) applies to all conspiracies motivated by sex-based animus; this may be unconstitutional as applied to private conspiracies, but the defendants lack standing to challenge the statute on that ground because they are state actors. Private defendants would of course have standing to raise such a challenge; if that challenge were successful, we would have created a scheme in which section 1985(3) could be used against state actors but not against private conspirators. I cannot see the difference between creating such a scheme and imposing a state action requirement on section 1985(3). The fact that the majority creates only half of the scheme today does not alter the nature of the scheme it is creating.

III.

The majority says that it will "leave for another day and case the issue of whether [section 1985(3) ] may be applied constitutionally to other sex-based animus conspiracies [besides those involving state actors]." *Ante* at 1370. The majority fails to consider what will happen on that day and in that case. A plaintiff complaining of sex discrimination will bring a section 1985(3) suit against private persons; the court will be forced to decide whether the plaintiff has stated a claim. If the court determines that the plaintiff has a claim, then it ignores the Constitution by sustaining a remedy that Congress did not have the power to create. If the court determines that the plaintiff does not have a claim because the defendants are not state actors, then that holding—combined with the holding in this case—imposes a state action requirement on section 1985(3), in blatant violation of statutory language, legislative history, and Supreme Court precedent. There are no other options.

The majority boxes us into this corner by trying to decide this case without defining the scope of section 1985(3). Section 1985(3) clearly covers conspiracies (involving either private or public actors) motivated by race-based animus. I leave open—as the Supreme Court has consistently done—the possibility that some form of animus other than race-based animus may be covered by the statute. *See Bray,* 506 U.S. at 268-69, 113 S.Ct. at 759; *Scott,* 463 U.S. at 836-37, 103 S.Ct. at 3360; *Griffin,* 403 U.S. at 102 n. 9, 91 S.Ct. at 1798 n. 9. I cannot, however, discern any reasoning that is true to both the statute and the Constitution under which I may hold that section 1985(3) covers conspiracies motivated by sex-based animus. I am therefore persuaded that the plaintiff in this case does not have a prima facie case under section 1985(3). Insofar as the majority holds that she does, I dissent. As for the remaining portions of the majority opinion (Parts I and III), I wholeheartedly concur.

ANDERSON, Circuit Judge, concurring in part and dissenting in part:

I concur in all of Judge Carnes' opinion for the court, except Part III.E. In applying the new test for determining whether two state or local governmental entities will be treated as a "single employer" under Title VII, I agree with Judge Kravitch (and for the reasons she articulates) that there remain genuine issues of material fact, thus making summary judgment inappropriate.

EDMONDSON, Circuit Judge, concurring in part and dissenting in part, in which COX, BIRCH and DUBINA, Circuit Judges, join:

The Civil War came close to destroying the United States forever. The War was a brutal physical contest, in which valor was common on both sides. Our great nation was preserved, but at a terrible price. For example, in the four years of the War, the federal army of about 1,500,000 troops suffered 634,703 casualties (359,528 dead and 275,175 wounded).[1] The War also cost the federal government, at least, $15,000,000,000. I doubt that we can today appreciate the depth of feeling about sacrifice and about loss (tinged with bitterness) that loomed over the country and Congress in the decade following the War.

One issue over which the War had been fought was slavery. The fate of slaves, recently freed at such severe cost to the Union, was a great concern during the Reconstruction era. Radical Reconstruction was rough for southern whites. Some strongly resented the political influence of freed slaves and of those persons working with freed slaves. There was resistance, and organizations such as the Ku Klux Klan arose in the South. These organizations engaged in terroristic conduct. This conduct was aimed at intimidating the freed slaves and their white allies. The allies were often former union soldiers and mostly Republicans. These hard realities made up the situation Congress (dominated by northern Republicans) faced in 1871 when it enacted the Ku Klux Klan Act, including what is now 42 U.S.C. § 1985(3).

---

[1]By way of comparison, a much more populous United States, with a much larger military, fighting worldwide, suffered a loss of 292,131 dead in World War II.

Our job in construing a statute is to determine congressional intent. In my view, 42 U.S.C. § 1985(3) is the product of this concrete historical situation. The statute speaks to the concerns of the situation. The text of the statute must be interpreted in the context of this history. Most important, it is the qualities of the text when it was written—and not our response to it as modern readers—that must be our guide. In addition, what we personally might like this statute to mean (or the law, in general, to be) in the light of current circumstances and changed ideas has no rightful place in our work: reinvention of the statute cannot properly be what we are after.

The question today is whether 42 U.S.C. § 1985(3) extends to cover persons conspired against because of their sex.[2] Sexual discrimination was no issue in the Civil War or in Reconstruction.[3] And looking at the circumstances existing in 1871, I am unpersuaded that sexual discrimination was in the mind of Congress when section 1985(3) was passed. The language of the pertinent statute is pretty broad. But the Supreme Court has already indicated—in 1983—that neither the language of section 1985(3) nor its legislative history readily answers questions about the section's scope. Despite the statute's language, "it is a close question whether section 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause, most notably Republicans." *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 103 S.Ct. 3352, 3360, 77 L.Ed.2d 1049 (1983) (construing "intent of the 1871

[2]This case concerns the scope of the cause of action made available by section 1985(3) to those injured by conspiracies formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."

[3]Plaintiff is a white woman. At its core, the section was intended to protect blacks and those who supported blacks; thus, white women, along with everyone else, are doubtlessly protected by the statute as long as they are being conspired against on account of helping a racial group. The question presented in this case then is not whether women are protected by the statute (they are), but whether the statute extends protection to women (or to anyone else) in this kind of case.

Congress" and holding that section does not reach conspirators motivated by bias against a group

on account of their economic views).[4]

Since 1983, no new information has come to light that would make this court better informed

about the intent of the 1871 Congress than the Supreme Court was informed in 1983.[5]   The

---

[4]The Supreme Court in *Scott* was unpersuaded by a "plainlanguage" argument that conspiracies not based on race are included in 1985(3).  So am I.

> The plain-language doctrine of statutory interpretation is usually best to determine the true intention of Congress, but judges usually are looking at statutes enacted by—at least roughly speaking—their own contemporaries.  As contemporaries, we share with the pertinent Congress basically the same environment of circumstances and facts that surrounded the enactment of the statute;  and when we see in the statute's words an unambiguous plain meaning, we see that plain meaning in the light of our shared contemporary conditions.  But as I have observed, "[w]hen ... much older statutes are being construed by modern courts, our response as modern readers to the words of the statute may not be what the words meant to the Congress speaking at a very different time." *United States v. Steele,* 147 F.3d 1316, 1320-21 (11th Cir.1998) (en banc) (Edmondson, J., concurring).

> When we are looking at a statute that is almost 130 years-old, we know that, in the meantime, conditions and ideas have changed;  the passage of time is enough to inject considerable uncertainty in my mind about the meaning of what the 1871 Congress said with the statute.  Just reading the words today is not enough to know what the words used in 1871 meant to that Congress.  Congress's intent at the time of the statute's enactment cannot be reliably ascertained without taking into account the historical context of the statute.

[5]I do not say that the Supreme Court's words in *Scott* can be read as a holding which is binding on us, but the Court's words have consequence.  Furthermore, I agree with the Supreme Court.  The arguments made to support a construction of 1985(3) to extend beyond race are not compelling.

> Some argue that the section's protections track the protections of the Equal Protection Clause of the Fourteenth Amendment, which the Supreme Court has construed to go beyond race.  But, section 1985(3) does not actually say (although it could have done so à la 42 U.S.C. § 1983) that it incorporates the Fourteenth Amendment or the Constitution.  And the Fourteenth Amendment was enacted by a different Congress (the 39th) than the Congress (the 42d) that enacted section 1985(3):  words can mean different things to different Congresses.  In addition, the Supreme Court has already said that "Equal Protection Clause jurisprudence is [not] automatically incorporated into § 1985(3)." *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 113 S.Ct. 753, 761

legislative-history equivalent of the Dead Sea Scrolls has not been discovered or called to our

n. 4, 122 L.Ed.2d 34 (1993). Even if one accepts that the Congress in 1871 intended the words in section 1985(3) to mean the same thing as the Equal Protection Clause, it would seem that the intention would be that the section's words mean the same thing as the Equal Protection Clause's words were understood to mean in 1871, which may well be different than what we understand the Clause to mean today. Furthermore, section 1985(3) was enacted—at least in substantial part—on the basis of the Thirteenth Amendment, which deals directly with the badges and incidents of "slavery."

Others point out bits of legislative history that they say show a broader intent. The legislative history—which is filled with references to freed slaves and their supporters and to the Klan—is long. The bits that might be said to point beyond race are very few and short. And, the statements of individual legislators are not ordinarily given controlling effect. *See, e.g., Brock v. Pierce County,* 476 U.S. 253, 106 S.Ct. 1834, 1840-41, 90 L.Ed.2d 248 (1986).

Some others say that, even if it is true that the 1871 Congress did not have in mind discrimination against persons other than black people when Congress enacted section 1985(3), it is proper to extend the statute to cover reasonably comparable evils. They cite *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). *Oncale* decided that a statute that undoubtedly was enacted to prohibit sexual discrimination reaches all kinds of sexual discrimination, including male-on-male discrimination. I say the *Oncale* reasoning would allow section 1985(3) to reach all kinds of racial discrimination and not just discrimination against black persons, although former slaves were precisely who Congress had in mind. But *Oncale* 's reasoning does not license federal courts to start including a whole new category of discrimination within a statute's coverage if Congress did not have that kind of discrimination in mind at all.

Never has the Supreme Court decided whether section 1985(3) extends beyond race to sex. Therefore, stare decisis and similar doctrines—which require courts to stand by previously decided matters—can dictate nothing to us. Still, some people take what they might call a realist view, observing that several of the present members of the Supreme Court have individually said—at one time or another—that 1985(3) does cover conspiracies other than those based on race. These "realists" see the handwriting on the wall. They predict the Supreme Court ultimately will extend the statute to conspiracies based on sex and say, therefore, that lower courts should take the step now. I think that predicting what the Supreme Court will do in the future is hard. Justices are not bound by their statements in concurrences or dissents or in decisions while serving on lower courts. More important, our judicial duty, as I understand our promises, is to study section 1985(3) using the usual legal methods and to decide the case accordingly and independently. The job of a United States Circuit Judge is not just to bet on which way the Supreme Court will come down later. I think the nonbinding observations of individual Supreme Court justices are not so much to be counted by us, as they are to be weighed.

attention. When we are construing statutes and, therefore, congressional intent, we must never allow guessing to masquerade as interpretation. Also we, as judges, must always know what we do not know. In my view, we cannot know with reasonable certainty that the 1871 Congress intended to reach conspiracies other than those based on race.

To extend section 1985(3) to cover persons conspired against because of their sex would represent an important decision on public policy. This kind of public-policy decision is beyond our legitimate power when the congressional intent is so unclear. An ancient legal maxim says that "where you doubt, do nothing."[6] I think we should do nothing here. We should not err on the side of an innovative expansion of an old statute. To do so is not just a mistake of principle, it is dangerous. "The federal balance is a fragile one, and a false step in interpreting § 1985(3) risks making a whole catalog of ordinary state crimes a concurrent violation of a single congressional statute passed more than a century ago." *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 113 S.Ct. 753, 768, 122 L.Ed.2d 34 (1993) (Kennedy, J., concurring).

I believe that we do our duty when we admit that we do not know whether certain conduct was intended by Congress to be covered by a statute or not. We cannot properly do more in this case. I accept the principle that Congress and the President—political officers elected by the American people—should decide public policy questions, such as the one underlying this case. The political branches (and not the judicial branch) should decide whether a federal statute—along the lines of 42 U.S.C. § 1985(3): that is, a statute directed largely towards private conduct and without expressed limits tied to state action, interstate commerce, federal funding and so on—is fitting and

---

[6]*Quod dubitas, ne feceris.* S.S. Peloubet, *Legal Maxims* 253 (1985); *Black's Law Dictionary,* 1127 (5th Ed.1979).

needed to cover persons conspired against on account of their sex.[7]

When I disagree with the court, I commonly file no dissent. Dissenting is rarely the best use of the judge's time and energy. Dissents can also be counterproductive in other ways. If the legal principles involved seem to me to be important enough, I may write something, however. Even then, because my dissent will govern no one (not even me) while the court's opinion will govern everyone in three states, I sincerely hope that the court's view of the case is the correct one—setting out the true law—and that my view is the incorrect view. I know that my colleagues' motives are good. But for the reasons I have tried to explain briefly, I cannot today go along completely.

I concur in this court's opinion and judgment, except the part about 42 U.S.C. § 1985(3).

HULL, Circuit Judge, concurring specially:

I concur in all of the majority opinion including the entire section addressing the § 1985(3) issue. I write separately only to emphasize my view that, on the § 1985(3) issue, we do not write on a clean slate. It is true, as the dissents point out, that the Supreme Court's decisions in *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), *United Brotherhood of Carpenters and Joiners of America v. Scott,* 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983), and *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) do not expressly hold that § 1985(3) protects against conspiracies motivated by a gender-based animus. However, the Supreme Court has strongly indicated that the broad language of § 1985(3) prohibits gender-based conspiracies. In my view, the Supreme Court's direction on this issue is unmistakable to the point that no principled way exists for this Court to hold, as suggested by the

---

[7]By the way, although the Supreme Court signaled in 1983 that it was by no means clear that section 1985(3) reached beyond race, Congress in 1991—when it amended many civil rights statutes—did not expand the section to make it plain that nowadays the section's coverage ought to go beyond race. But Congress has enacted other statutes that prohibit discrimination on the basis of sex in a number of specific contexts.

dissents, that § 1985(3) prohibits only conspiracies motivated by racial animus.

In *Griffin,* the Supreme Court recited its interpretation of the broad language in § 1985(3). The Court held that to prove a § 1985(3) violation, a plaintiff must show "some racial, or perhaps otherwise class-based, invidiously discriminatory animus" behind the conspirators' actions. *Griffin,* 403 U.S. at 102, 91 S.Ct. 1790. In *Griffin,* the Court expressly reserved the question of whether § 1985(3) applied to conspiracies motivated by invidious intent other than race. *Griffin,* 403 U.S. at 102 n. 9, 91 S.Ct. 1790. Nonetheless, as the majority in this case cogently observes, for the Court's language "otherwise class-based, invidiously discriminatory animus" to have any meaning, "otherwise class-based ... animus" must include animus directed against women—or men for that matter.

Quite to the contrary of the inferences drawn by the dissents, in my view, *Griffin, Scott,* and *Bray,* provide strong guidance that the Supreme Court views § 1985(3) as encompassing gender-based conspiracies. Each of these cases presented the Court with the opportunity to limit the reach of § 1985(3) to only conspiracies motivated by racial animus. That the Court declined all three of these opportunities speaks loudly.

*Griffin* involved a racial conspiracy. As a race case, *Griffin* presented the perfect opportunity for the Court to suggest that § 1985(3) was intended solely to protect African Americans. Indeed, *Griffin* did not require the Court to discuss the scope of § 1985(3) beyond holding that it prohibited conspiracies motivated by a racial animus. Nevertheless, the Court made its pronouncement that § 1985(3) required a showing of "some racial, or perhaps otherwise classbased, invidiously discriminatory animus." *Griffin,* 403 U.S. at 102, 91 S.Ct. 1790. The Court's reasoning behind this statement is apparent. Obviously, § 1985(3) was intended, first and foremost, to address the plight of African Americans during Reconstruction, but the language used in the statute suggests that it

encompasses a broader range of conspiracies—thus, the phrase "otherwise class-based, invidiously discriminatory animus."

Likewise, in *Scott,* the Supreme Court declined again to interpret § 1985(3) as prohibiting only race-based conspiracies. As noted by the majority in the instant case, the Court in *Scott* held that § 1985(3) does not prohibit "conspiracies motivated by economic or commercial animus." 463 U.S. at 836, 103 S.Ct. 3352. In doing so, the Court recited legislative history supporting the notion that "[t]he predominate purpose of § 1985(3) was to combat the prevalent animus against Negroes and their supporters." *Id.* Despite the Court's emphasis of this legislative history, the Court declined the opportunity to limit the applicability of § 1985(3) to race-based conspiracies.

Moreover, *Bray* presents the clearest illustration of the Supreme Court's implicit recognition that § 1985(3) prohibits conspiracies motivated by a gender-based animus. In *Bray,* the Court addressed the issue of whether opposition to abortion constitutes "class based, invidiously discriminatory animus." 506 U.S. at 269, 113 S.Ct. 753. The district court in *Bray* had concluded that such a conspiracy amounted to discrimination against the " "class' of women seeking abortions," and the plaintiffs argued that opposition to abortion included an animus against "women in general." *Id.* Obviously, the Court's easiest and most direct path to reversing the district court, and rejecting the plaintiffs' argument, would have been to hold simply that § 1985(3) does not prohibit gender-based conspiracies. However, the Court did not follow this path.[1] Instead, Justice Scalia's majority opinion undertook a protracted, detailed analysis to reject the conclusion that opposition to abortion equates with discrimination against women. The Court's opinion in *Bray* reflects the unavoidable facts that (1) § 1985(3)'s broad language does not itself suggest that it is limited only

---

[1]Importantly, in none of the five separate opinions in *Bray* did any of the Justices opine that gender-based conspiracies were beyond the reach of § 1985(3).

to race-based conspiracies and (2) the Supreme Court's statement in *Griffin* that § 1985(3) requires proof of a "class-based animus" recognizes the broad sweep of the protection afforded by § 1985(3).

In the instant case, the dissents do not sufficiently heed the Supreme Court's guidance on this issue. One dissent admonishes that "[t]he job of a United States Circuit Judge is not just to bet on which way the Supreme Court will come down later." Similarly, the other dissent describes this issue simply as "open."

In my view, interpreting *Griffin, Scott,* and *Bray* as providing strong guidance on this issue does not involve betting "on which way the Supreme Court will come down later," nor is this issue simply "open." Instead, the majority's conclusion that gender is a class protected under § 1985(3) is the only holding that follows in a principled way the Court's statement in *Griffin* and its reaffirmation of this statement in *Scott* and *Bray*. The lack of a direct holding leaves this Court at best "wiggle room" to write around the Court's statement in *Griffin*. However, *Griffin, Scott,* and *Bray,* in my opinion, direct us to the path to follow in § 1985(3) cases, and stare decisis dictates that we should follow it—until the Supreme Court tells us otherwise. In this regard, I note Justice Souter's observation in his opinion in *Bray* that "I know of no reason that would exempt us from the counsel of stare decisis in adhering to this settled statutory construction ... which Congress is free to change if it should think our prior reading unsound." 506 U.S. at 289, 113 S.Ct. 753 (Souter J., concurring in part and dissenting in part).

*Griffin, Scott,* and *Bray* have guided seven circuits to conclude that § 1985(3) embraces suits premised on gender-based conspiracies. Likewise, this Supreme Court precedent is why four Supreme Court Justices have stated recently their views that § 1985(3) encompasses gender-based conspiracies. *Bray,* 506 U.S. at 295, 113 S.Ct. 753 (Souter, J., concurring in part and dissenting in part) ("To be sure, there is some resonance between *Griffin* 's animus requirement and those

constitutional equal protection cases that deal with classifications calling for strict or heightened scrutiny ... [such as] race, national origin, alienage, gender, or illegitimacy."); *Bray,* 506 U.S. at 319, 113 S.Ct. 753 (Stevens, J., dissenting) ("The text of the statute provides no basis for excluding from its coverage any cognizable class of persons who are entitled to the equal protection of the laws."); *Bray,* 506 U.S. at 348, 113 S.Ct. 753 (O'Conner J., dissenting) ("I would ... find in today's case that § 1985(3) reaches conspiracies targeted at a gender-based class...."); *Great American Federal Savings and Loan Assn. v. Novotny,* 442 U.S. 366, 389 n. 6, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979)(White, J., dissenting) ("It is clear that sex discrimination may be sufficiently invidious to come within the prohibition of § 1985(3)."). I agree with the majority that we are required to join the seven circuits, and the four Justices, to conclude that § 1985(3) prohibits gender-based discrimination.

Finally, I am sensitive to the sound policy arguments raised in Judge Tjoflat's dissent. Nevertheless, the Supreme Court has offered clear guidance on this issue, and I do not believe that the Supreme Court's pronouncements can be avoided in any principled way.

For these reasons as well as those articulated in the majority's opinion, I concur.

KRAVITCH, Senior Circuit Judge, concurring in part and dissenting in part:

I concur in Part I of the majority opinion, which reinstates that portion of the panel opinion remanding the case to the district court for reconsideration of the section 1983 claim because Lyes's pleadings were sufficient to provide the district court and the appellees with notice that she alleged a violation of the Equal Protection Clause of the Fourteenth Amendment. I also concur in Part II of the majority opinion, in which this court joins every other circuit that directly has decided the issue in holding that 42 U.S.C. § 1985(3) prohibits sex-based conspiracies, at least where they involve state action. With respect to Part III, however, I dissent in part.

I. The New Public Single Employer Test

In Part III, the majority formulates a new test for determining whether two ostensibly independent state or local government entities should be considered a "single employer" for Title VII purposes. It then finds that the district court properly granted summary judgment in favor of the appellees on Lyes's Title VII claim because Lyes did not produce evidence sufficient for a reasonable factfinder to conclude that the City of Riviera Beach Community Redevelopment Agency (the "CRA") and the City should be aggregated under this new public single employer test.

Before articulating the new standard for deciding whether governmental entities should be consolidated under Title VII, the majority considers but rejects the four-factor test that the National Labor Relations Board ("NLRB") applies to decide whether to aggregate ostensibly separate private employers.[1] I would have preferred that this court adopt the NLRB test regardless of whether the entities in question are public or private. Although the NLRB originally adopted this four-factor test in the context of deciding which private employers it would subject to its jurisdiction in labor relations disputes, *see Radio & Television Broad. Technicians Local Union 1264 v. Broadcast Serv. of Mobile, Inc.,* 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965), in *McKenzie v. Davenport-Harris Funeral Home,* 834 F.2d 930 (11th Cir.1987), we joined the majority of circuits in applying this test in the Title VII context in cases involving private entities.[2] For the reasons

---

[1] These four factors are (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. *See, e.g., Radio & Television Broad. Technicians Local Union 1264 v. Broadcast Serv. of Mobile, Inc.,* 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965).

[2] The Second, Fifth, Sixth, Eighth, Ninth, and Eleventh Circuits all employ the NLRB test to determine whether private entities should be aggregated for Title VII purposes. *See* Majority Op. at 1373. The Tenth Circuit "ha[s] yet to adopt the [NLRB] single employer test, having found it unnecessary in several cases to resolve the issue definitively," but it has not rejected the test. *Lockard v. Pizza Hut, Inc.,* 162 F.3d 1062 (10th Cir. 1998). The remaining circuits apparently have not addressed this issue.

described below, I would have extended the application of the NLRB test to Title VII suits against government employers, as well.

As the majority recognizes, the Supreme Court specifically has held that Title VII principles and standards apply with equal force to private and public employers. *See* Majority Op. at 1373. Federal courts have been using the NLRB test in Title VII cases involving private entities for more than 20 years,[3] and therefore have developed continuity and expertise in applying it. Creating a different test for deciding whether to consolidate public employers, who must abide by the same Title VII rules as private employers, requires the courts to start again, evolving and shaping a new standard. Given the flexibility of the existing single employer test, this approach is unnecessary. The NLRB test is not a strict formula, but instead embodies factors commonly recognized to characterize coordinated enterprises. It acknowledges that no two operations are exactly alike; therefore, as the majority points out, "[c]ourts applying the NLRB "single employer' test to private entities in Title VII cases have held that not every factor need be present, and no single factor is controlling." Majority Op. at 1372 n. 5 (citing three cases recognizing this proposition).

A number of courts already have demonstrated that the NLRB test can be applied to government employers with little difficulty. *See Riley v. County of Pike,* 761 F.Supp. 74, 76-77 (N.D.Ind.1991) (holding, in age discrimination case under ADEA, that "same considerations are pertinent" when deciding single employer issue for public entities as for private entities and applying NLRB test to resolve the question; noting that where government entities are concerned, court also must keep constitutional separation of powers issues in mind); *Vandermeer v. Douglas County,* 15 F.Supp.2d 970, 975-79 (D.Nev.1998) (conducting extensive analysis, using NLRB four-factor test,

---

[3]The Eighth Circuit was the first court to use this test to decide whether two employers should be aggregated under Title VII. *Baker v. Stuart Broadcasting Co.,* 560 F.2d 389 (8th Cir.1977).

to decide whether Fire and Paramedic Districts and County should be aggregated for Title VII purposes; noting that fact that state might consider the entities to be separate was relevant but not controlling). In my view, all of these advantages outweigh the slight awkwardness created in the public employer context by the labeling of the fourth factor of the NLRB test—common ownership or financial control—which admittedly is more helpful in our analysis of the relationship between parent and subsidiary corporations than governmental bodies.[4]

The majority also contends that the third factor of the NLRB single employer test—common management—is an inappropriate consideration in the government entity aggregation context. I disagree. The majority explains its rejection of the third factor by stating that "[w]hile [the common management factor] may be an appropriate yardstick in some instances, in others two public entities may share managers or other employees while remaining politically separate and distinct." Majority Op. at 1374. This reasoning is circular: the fact that the sharing of personnel may not justify, in some situations, aggregation under Title VII does not mean that courts should simply ignore the common management factor in every case. Again, under the NLRB test, no one factor controls the outcome of the "single employer" analysis in a given case.

Upon rejecting the NLRB test as an inappropriate standard for deciding when government entities should be aggregated for Title VII purposes, the majority formulates a new test for making this determination. In large part, this test mirrors the NLRB standard. After holding that comity and

---

[4]This minor obstacle, however, has not hindered district courts that have employed this test where aggregation of government entities was at issue. For example, in *Vandermeer,* the court applied this element of the test by considering sub-factors such as ability to raise revenue, division of funds, independence of property ownership, separation of accounting records, and payment of bills and debts. 15 F.Supp.2d at 978. This approach is not unlike that taken by the panel in this case, which, in analyzing the fourth factor, recognized the extensive intermingling of CRA and City funds, including the facts that the CRA received two-thirds of its budget, and, on one occasion, an interest-free loan, from the City. *See Lyes v. City of Riviera Beach,* 126 F.3d 1380, 1387 (1997), *opinion vacated and reh'g en banc granted,* 136 F.3d 1295 (11th Cir.1998).

federalism considerations require us to defer to Florida's delineation between the CRA and the City in this and other cases in which a state has designated the relevant political bodies as separate entities,[5] the majority recognizes that courts still may find that purportedly independent government bodies should be considered a single employer under Title VII. A plaintiff can show that aggregation of public entities is appropriate either by proving that the state created the "separate" units to evade federal law or by demonstrating "other factors" "plainly indicat[ing] integration" of the entities. Majority Op. at 1376.

In deciding what factors courts should assess under this new public single employer test, the majority looks to "the factors courts have considered in Title VII cases involving private employers"—primarily the NLRB factors. Majority Op. at 1376. The majority focuses upon "centralized control of labor relations" (NLRB factor 2) as the dominant consideration of the public single employer test;[6] it also cites "interrelation of operations" (NLRB factor 1) as an important component of this analysis. *Id.* The majority concludes by observing that the factors it mentions are not exhaustive. *Id.* Thus, despite my preference for extending the NLRB test to govern the aggregation analysis for public as well as private employers, because the standard that the majority has developed significantly parallels the NLRB test, I do not dissent from its adoption.

---

[5]The majority summarizes the first step in the new standard it promulgates as follows: "we begin with the presumption that governmental subdivisions *denominated as separate and distinct under state law* should not be aggregated for purposes of Title VII." Majority Op. at 1377 (emphasis added). This formulation echoes the concerns the majority repeatedly expresses regarding the implications of federalism and comity where the state legislature has delineated government entities as separate from one another. As I read the majority opinion, therefore, this presumption only applies in a situation, such as the one before us in this case, in which the state legislature created the entities in question as "independent legal bodies." Majority Op. at 1378.

[6]Courts frequently have observed that under the NLRB test as applied in the Title VII context, this factor should receive the most weight. *See* Barbara Lindemann & Paul Grossman, Employment Discrimination Law 1310 (Paul W. Cane, et al., eds., 3d ed.1996).

## II. Applying the New Test

Applying the majority's public single employer analysis, and accepting the presumption that test creates that the CRA and the City should not be aggregated for Title VII purposes,[7] I dissent from the majority's conclusion that summary judgment was proper in this case. Looking first at the two NLRB factors still viable under the new test, the record shows that Lyes presented significant evidence that the City and CRA had interrelated operations and that the City controlled decisions regarding the CRA's employees. As the panel opinion pointed out, the record contains several pieces of evidence from different sources indicating that the City treated the CRA merely as one of its departments. These items include the CRA bylaws, which, at least until one month before Lyes's termination, obligated the CRA Executive Director to report to and coordinate the CRA agenda with the City Manager;[8] a widely published advertisement for the City Manager position seeking applicants with experience directing departments of a full service municipality and CRA; and a written performance review of Lyes by Tony Smith, the City Manager/CRA Executive Director, appearing on a City form and listing the CRA as a department of the City.[9]

---

[7]*See supra* note 5 and accompanying text.

[8]The parties introduced two different versions of the CRA bylaws. Lyes's version contained this language, but the appellees' version, marked "Revised 11/17/93," did not.

[9]The majority finds this last piece of evidence to be of little or no significance given Smith's dual role at the time. In downplaying the importance of this incident, the majority ignores the fact that Smith listed the CRA as a "department" of the City on the form, a detail with broader implications in terms of the level of CRA/City integration than a simple error in choosing the wrong sheet of paper to complete an evaluation. The majority also improperly weighs this evidence: it is up to the factfinder—not this court—to decide the significance of Smith's commingling of City and CRA activities. Although it is possible to infer from the written performance review that Smith mistakenly picked up a City form, or perhaps that he had run out of CRA stationery, and incorrectly listed "CRA" as a "department" without realizing the potential consequences of that act, it is also quite plausible that Smith himself was confused about the division of his duties as City Manager and Executive Director of the CRA. The latter scenario strengthens Lyes's argument that the City and CRA were one integrated organization for

Multiple indicia of City control over CRA employment decisions also appear in the record. As mentioned above, Smith's evaluation of Lyes's performance on a City form and possibly in his capacity as City Manager,[10] and the CRA bylaws' requirement that the CRA Executive Director report to the City Manager, raise questions about whether the CRA independently managed its staff during Lyes's period of employment. Additionally, the Executive Director's request that the City personnel director review his decision to discipline Lyes and the City attorney's participation in the CRA Board's hearing considering Lyes's petition for reinstatement could support Lyes's position on the single employer issue.[11] With respect to the majority's observation that which entity had the obligation to pay the charging party's salary could affect this analysis, the factfinder also could take into account the CRA's budget, two-thirds of which the City supplies.

Finally, the majority acknowledges that the public single employer test requires us to consider the totality of the circumstances. Although the NLRB common management factor is not an element of our analysis under this test, I see no reason for the court to ignore the reality of the situation presented in this case by refusing to acknowledge the *identical* composition of the

---

Title VII purposes.

[10]*See supra* note 9 and accompanying text.

[11]Again, the majority inappropriately weighs this evidence when it concludes that "there was no indication that this review had any binding effect. Instead, it *appears* to have been an effort to seek the opinion of a third party as to whether [the Executive Director] had acted fairly in disciplining Lyes. *In this sense,* [it] was not unlike seeking advice from an expert in employment relations." Majority Op. at 1379 (emphasis added). This reasoning is highly speculative. No evidence regarding the impact of this review appears in the record, and therefore its effect on the aggregation question is an issue for the factfinder. Nor does the record indicate the reason the Executive Director asked for the review; thus, the purpose for which he sought the personnel director's opinion also was a matter for the factfinder to decide. There simply is no basis in the record from which unequivocally to conclude that when the city personnel director reviewed Lyes's discipline, he provided nothing more than non-binding, independent expert advice to the Executive Director.

respective policymaking bodies of these entities—the City Council and the CRA Board—and, for eighteen months, the role of Tony Smith as both City Manager and CRA Executive Director. The Florida statute's designation of the CRA as a legal entity separate and independent from the City may have presumptive weight under our new public single employer test, but the fact that the state statute *permits* the City Council and the CRA Board to have the same members does not exempt that arrangement from review. At the very least, a factfinder should scrutinize this system to evaluate the degree to which these officials were able to keep their two roles separate.

Unquestionably, some information in the record points to the conclusion that the City and the CRA were sufficiently distinct that we should not aggregate them for purposes of Title VII. Because the majority opinion catalogs this evidence, *see* Majority Op. at 1378-79 & nn. 10-11, see no need to discuss it again here. Considering all of the evidence—and all reasonable inferences that can be drawn from it—in the light most favorable to Lyes, as we must for summary judgment purposes, however, a reasonable factfinder could determine that Lyes clearly overcame the presumption in favor of appellees on the single employer issue, thus making summary judgment inappropriate. As to the majority's conclusion to the contrary, I therefore respectfully dissent.