Annie S. WALKER, Plaintiff,

v.

BOYS AND GIRLS CLUB OF AMER-ICA, Boys and Girls Club of Lee County, Defendants.

No. Civ.A. 98–A–430–E.

United States District Court,
M.D. Alabama,
Eastern Division.

March 19, 1999.

Lee Winston, Birmingham, AL, for plaintiff.

Charles A. Stewart, Montgomery, AL, William Clineburg, Atlanta, GA, Robert T. Meadows, Opelika, AL, for defendants.

## MEMORANDUM OPINION

ALBRITTON, Chief Judge.

### I. *INTRODUCTION*

This case is before the court on a Motion for Summary Judgment filed by Defendant Boys & Girls Clubs of America, Inc. on January 6, 1999, and a Motion for Summary Judgment filed by Defendant Boys and Girls Club of Greater Lee County, Inc. on January 7, 1999. For the reasons to be discussed, both motions are due to be GRANTED.

### II. *SUMMARY JUDGMENT STANDARD*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–324, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

### III. *FACTS*

The submissions of the parties establish the following facts:

On December 18, 1995, Plaintiff Annie S. Walker began her employment as Executive Director of the Boys and Girls Club of Greater Lee County ("Greater Lee County B & GC"). Greater Lee County B & GC is a non-profit organization which was incorporated in Lee County, Alabama in July 1989. The Club has a board of directors composed entirely of volunteers from the local community. As Executive Director, Ms. Walker was responsible for all the operations of Greater Lee County B & GC's clubs. Greater Lee County B & GC is a member organization of the Boys and Girls Club of America (B & GCA).

B & GCA is a non-profit corporation chartered by the United States Congress to promote the health, social, educational, vocational, and character development of America's youth. *See* 36 U.S.C. § 691 *et seq.* B & GCA has a mission of "providing national leadership in the development of the Boys & Girls Clubs of America movement; developing activities which enable Member Organizations to render better service to their members; and providing

assistance to communities in the establishment of new Clubs." Defendant B & GCA's Exhibit A, Smith Aff. ¶ 3. To fulfill this mission, B & GCA grants memberships to organizations in communities throughout the United States and provides assistance and resources which member organizations require to serve youth in their communities. *See id.*

In September of 1996, Ms. Walker began experiencing problems with her eyesight and sought treatment in Opelika, Alabama. In October of 1996, Ms. Walker was hospitalized in Birmingham for problems with her vision. Ultimately, in December of 1996, Ms. Walker completely lost sight in her left eye. The Executive Committee of the Greater Lee County B & GC Board of Directors terminated Ms. Walker's employment on or about January 7, 1997. She filed the present action on April 10, 1998. Ms. Walker, who is African–American, contends that Defendants discriminated against her on the basis of disability and race with respect to treatment, discharge, discipline, and other terms and conditions of her employment.

## IV. *DISCUSSION*

### A. Plaintiff's Claims Under Title VII and the ADA

■ Plaintiff Annie Walker asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* A plaintiff may bring a Title VII action against any "employer," defined as "a person engaged in an industry affecting commerce who has fifteen or more employees ..." 42 U.S.C. § 2000e(b). The relevant portion of the definition of "employer" in the ADA is identical to the definition in section 2000e(b) of Title VII. 42 U.S.C. § 12111(5)(A). If the Plaintiff cannot establish that the Defendants meet the statutory definition of "employer," this court lacks jurisdiction to hear the plaintiff's Title VII and ADA claims. *See Virgo v. Riviera Beach Associates, Ltd.,* 30 F.3d 1350, 1359 (11th Cir.1994).

Plaintiff concedes that the Greater Lee County B & GC does not meet the jurisdictional minimum number of employees to be covered by Title VII or the Americans with Disabilities Act. Plaintiff contends, however, that the number of employees at the Greater Lee County B & GC should be aggregated with the number of employees at B & GCA to satisfy the jurisdictional threshold.

The Eleventh Circuit recently summarized the theories available for aggregating the number of employees of legally distinct entities as follows:

> We accord a liberal construction to the term "employer" under Title VII. In keeping with this liberal construction, we sometimes look beyond the nominal independence of an entity and ask whether two or more ostensibly separate entities should be treated as a single, integrated enterprise when determining whether a plaintiff's "employer" comes within the coverage of Title VII. We have identified three circumstances in which it is appropriate to aggregate multiple entities for the purposes of counting employees. First, where two ostensibly separate entities are " 'highly integrated with respect to ownership and operations,' " we may count them together under Title VII. This is the "single employer" or "integrated enterprise" test. Second, where two entities contract with each other for the performance of some task, and one company retains sufficient control over the terms and conditions of employment of the other company's employees, we may treat the entities as "joint employers" and aggregate them. This is the "joint employer" test. Third, where an employer delegates sufficient control of some traditional rights over employees to a third party, we may treat the third party as an agent of the employer and aggregate the two when counting employees. This is the "agency" test.

*Lyes v. City of Riviera Beach, Florida,* 166 F.3d 1332, 1341 (11th Cir.1999) (citations omitted).[1]

Plaintiff does not assert in her brief that the "joint employer" test or the "agency" test applies to the facts of her case. She does assert that the Greater Lee County B & GC and B & GCA constitute a "single employer" or "joint enterprise" for purposes of aggregating employees. Under the "single employer" test, where two or more entities are "highly integrated with respect to ownership and operations," the corporations may be viewed as a "single employer" under Title VII. *McKenzie v. Davenport–Harris Funeral Home,* 834 F.2d 930, 933 (11th Cir.1987). Though aggregation under the "single employer" theory commonly is alleged in the context of a parent-subsidiary relationship, "it is not necessary for the parent-subsidiary relationship to exist for this theory to apply." *Landon v. Agatha Harden, Inc.,* 6 F.Supp.2d 1333, 1338 (M.D.Ala.1998).

■ To determine whether two or more legally distinct entities should be considered a "single employer" under Title VII, courts in this circuit utilize the standard developed by the National Labor Relations Board in NLRA cases. Under the NLRB standard, courts look to the following four criteria: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. *McKenzie,* 834 F.2d at 933. The focal point of the court's inquiry is "the degree of control an entity has over the adverse employment decision on which the Title VII suit is based." *Llampallas v. Mini–Circuits, Lab., Inc.,* 163 F.3d 1236, 1244 (11th Cir. 1998).

In *Lyes v. City of Riviera Beach, Florida,* the Eleventh Circuit held that the four-part standard is not applicable to state and local governmental subdivisions.[2] *Lyes,* 166 F.3d 1332, 1342–43. The court noted, "States are not the equivalent of corporations or companies, and local government bodies are not the same as subsidiaries." *Id.* at 1342. While governmental subdivisions such as counties, towns, or local agencies may share sources of ultimate political control or funding, they may be wholly distinct with respect to their day-to-day operations or control over employees. Thus, the court found that the fourth factor, common ownership or control, "has no application to the usual case involving governmental subdivisions." *Id.* at 1343. Similarly, the court found that the third factor, common management, often is inapplicable in the context of governmental entities because two public entities may share managers or employees while remaining politically separate and distinct. *Id.* Additionally, the court stated that a "more fundamental reason" for not applying the traditional four-part test involves "federalism and comity concerns." A court should give deference to a state's own distinctions between its governmental subdivisions. *Id.*

■ In place of the traditional four-part standard, the court held that when assessing whether multiple governmental entities are a "single employer," courts should apply a presumption against aggregation of governmental subdivisions denominated as separate and distinct under state law. *Id.* at 1345. To rebut the presumption, a plaintiff must produce evidence showing that either (1) a governmental entity was structured with the purpose of evading the reach of federal employment discrimination law, or (2) the presumption against aggregation is clearly outweighed by factors manifestly indicating that the public entities are so closely interrelated with

1. The various theories for aggregation of employees apply to the Plaintiff's ADA claims as well as her Title VII claims. *See, e.g., Swallows v. Barnes & Noble Book Stores, Inc.,* 128 F.3d 990, 992 n. 2 (6th Cir.1997) ("Because Title VII, the ADEA, and the ADA define 'employer' essentially the same way, we rely on case law developed under all three statutes.").

2. The court declined to express any view about which test should apply to aggregation issues involving federal governmental entities. *Lyes,* 166 F.3d 1332, 1344 n. 8.

respect to control of the fundamental aspects of the employment relationship that they should be counted together under Title VII. *Id.* The court noted that the first two factors of the traditional four-factor test, interrelation of operations and centralized control of labor operations, may continue to be helpful in the inquiry.

In the present case, Plaintiff suggests that because B & GCA is a federal instrumentality, the traditional four-factor test should not strictly apply. Plaintiff also asserts, however, that the presumption established in *Lyes* should not apply because B & GCA was chartered under federal law, as opposed to state law, and the congressional charter gives the national organization authority with respect to the establishment of local clubs. Conversely, B & GCA contends that the presumption in *Lyes* would apply because Congress intended B & GCA and member organizations, such as the Greater Lee County B & GC to be separate entities. Thus, although the *Lyes* court declined to express any view about whether the test it developed should apply to federal governmental entities, B & GCA asserts that the comity concerns raised in *Lyes* are relevant.

■ The court is skeptical of the Defendant's assertion that the test established in *Lyes* would apply to this case. Defendants in *Lyes* were a city and a community redevelopment agency created by the State legislature as an independent legal body. In contrast, B & GCA is a congressionally-chartered corporation, and Greater Lee County B & GC is an Alabama corporation which is simply a member organization of B & GCA. Many of the concerns raised in *Lyes* would not affect the applicability of the traditional NLRB four-part standard to the present case. Other courts have had little difficulty applying the traditional test to an analogous organization, the American National Red Cross. *See Owens v. American Nat'l Red Cross*, 673 F.Supp. 1156, 1160–61 (D.Conn.1987) (applying the four-factor test and concluding that the national organization was not plaintiff's employer); *Webb v. American Red Cross*,

652 F.Supp. 917, 919–22 (D.Neb.1986) (same). Nevertheless, the court need not resolve this issue. Even applying the less stringent traditional four-factor standard, B & GCA and Greater Lee County B & GC cannot be considered a "single employer" under Title VII.

### 1. Interrelatedness of Operations

The first factor mentioned in the NLRB standard is interrelation of operations. The NLRB has identified seven indicia of interrelatedness: (1) combined accounting records; (2) combined bank accounts; (3) combined lines of credit; (4) combined payroll preparation; (5) combined switchboards; (6) combined telephone numbers; and (7) combined offices. *See Fike v. Gold Kist, Inc.*, 514 F.Supp. 722, 726 (N.D.Ala. 1981) (citing *Western Union Corp. v. United Telegraph Workers*, 224 NLRB 274, 277, 1976 WL 7018 (1976), aff'd, 571 F.2d 665 (D.C.Cir.1978)); *see also Tatum v. Everhart*, 954 F.Supp. 225, 230 (D.Kan.1997). None of these elements exist in the present action. Greater Lee County B & GC establishes its own budget, pays its own bills, keeps its own books, keeps its own payroll, and controls its own buildings. Smith Aff. ¶ 5.

Plaintiff asserts, however, that the eligibility requirements for membership in B & GCA demonstrate the interrelatedness of the two organizations. Eligibility requirements for membership in B & GCA which the Plaintiff cites include: operating one or more clubs which meet stated minimum operating requirements, using the words "Boys Club" or "Girls Club" in the organization's title, adopting a Constitution, By-Laws and rules which are not inconsistent with the Eligibility Requirements, paying a charter fee, displaying the service mark of B & GCA on the outside of the organization's buildings, paying membership dues, completing an annual report to be rendered to B & GCA, paying at least 50% of benefits made available to employees, and maintaining insurance in which B & GCA is named as an additional insured.

See Plaintiff's Exhibit 16, Requirements for Membership Art. II.

In addition to the membership requirements, Plaintiff submits that Greater Lee County B & GC participated in B & GCA's health, medical, group life insurance, and pension plans.[3] Plaintiff's Exhibit 8. Plaintiff asserts that B & GCA made contributions to Plaintiff's pension when Greater Lee County B & GC fell behind. Plaintiff Aff. ¶ 5. Moreover, B & GCA provided funds to Greater Lee County B & GC in the form of pass-through grant money.[4] See Jane Walker Dep. at 10–11; Smith Dep. at 27–28. Such funds went into the general budget and were used to pay salaries of Greater Lee County B & GC employees. J. Walker Dep. at 11. According to Jane Walker, pass-through grants were a "very small source of financing" for the Greater Lee County B & GC. Id. The Greater Lee County B & GC Board of Directors was responsible for raising funds to support its organization. Smith Dep. at 33–34.

Plaintiff also stresses the presence of Bobby Lee Smith, Regional Service Director for the Southeast Regional Service Center of B & GCA. Mr. Smith described the services he rendered to member organizations as "consultant, provide technical assistance, make recommendations, offer suggestions." Smith Dep. at 131–32. Ms. Walker contacted Smith with questions. Smith Dep. at 63. She states that Smith provided assistance to the Greater Lee County B & GC in the development of personnel manuals and job descriptions, strategic planning, and preparing documents to obtain state dollars. On one occasion, Mr. Smith met with the Plaintiff and a board member about conducting an Executive Performance Review. See

Plaintiff's Exhibit 10. He noted that he would provide assistance to the Executive Committee in conducting the performance review and that he would schedule a field consultant to meet with Executive Walker. See id. Mr. Smith was present, by request of an Executive Committee member, at the meeting when the Executive Committee of the Greater Lee County B & GC Board of Directors voted to terminate Ms. Walker's employment. See Plaintiff's Exhibit 15, Jan. 6, 1997 Field Report.

Plaintiff submits that the purpose of B & GCA demonstrates its interrelatedness with member organizations. The purpose of B & GCA, set forth in its employee handbook, is as follows:

Boys & Girls Clubs of America provides Boys & Girls Club organizations with the resources, consultation, and support services necessary for Clubs to be their community's most effective youth development organization. B & GCA also promotes and supports the establishment of new Boys & Girls Clubs. In achieving its purpose, Boys & Girls Clubs of America balances its roles of providing leadership and direction for the Boys & Girls Club Movement with being responsive to local Clubs.

Plaintiff's Exhibit 13.

In *Webb v. American Red Cross*, 652 F.Supp. 917 (D.Neb.1986), a federal district court found that a national, congressionally-chartered organization and a local chapter were not a "single employer" under Title VII. The plaintiff argued that the operations of the entities were interrelated because the local chapter was required to send reports to the national organization, adhere to American National Red Cross guidelines, train its employees through in-

---

3. The submissions reflect that a separate entity, Boys & Girls Club Workers Association, provides insurance benefits, and a separate entity, Boys & Girls Clubs of America Pension Trust, provides pension benefits. See Plaintiff's Dep. at 252–53; Smith Aff. ¶ 6. Member organizations may choose to obtain benefits for employees through these sources, but they are not required to do so. Smith Aff. ¶ 6.

4. The pass-through grants are dollars from outside sources granted to B & GCA for a specific purpose. B & GCA makes its member organizations aware of the funding sources, and member organizations could apply for the grants through B & GCA. The outside funding sources establish the criteria for receipt of a grant. Smith Dep. at 28–29.

structors certified by the national organization, and provide examinations prepared by the national organization. *See id.* at 919. Additionally, the local chapter would not exist but for a charter from the American National Red Cross, and the national organization owned the property housing the local chapter. *See id.* Nonetheless, the court found that the operations of the two entities were distinct, relying primarily on their separate bylaws, separate financial affairs, and separate personnel policies. *See id.* at 920.

Similarly, a court recently held that a private, nonprofit corporation, the United Way of America, Inc., and a member organization were not a "single employer" under Title VII. *See Tatum v. Everhart,* 954 F.Supp. 225 (D.Kan.1997). Though member organizations had to pay dues and satisfy other requirements, the court found no interrelation of operations. *See id.* at 228–29. The national corporation and its member organization were incorporated separately, operated under separate bylaws, were governed by separate boards, had separate IRS exemptions, and exhibited none of the seven indicia of interrelatedness set forth by the NLRB. *See id.*

In the present case, there is a close connection between B & GCA and its member organization, the Greater Lee County B & GC. B & GCA acknowledges that it shares a common mission with its member organizations. Plaintiff's submissions, however, do not show an interrelation of the day-to-day operations sufficient to meet the first factor of the "single employer" test. B & GCA's provision of advice and support to Greater Lee County B & GC does not override the separateness of the entities.

**2. Centralized Control of Labor Relations**

The second factor of the NLRB standard—whether there is centralized control

of labor relations—"is usually accorded greater weight than the others." *Thornton v. Mercantile Stores Co.,* 13 F.Supp.2d 1282, 1291 (M.D.Ala.1998). The "control" required to meet the test of centralized control of labor relations is "actual and active control of day-to-day labor practices." *Fike v. Gold Kist, Inc.,* 514 F.Supp. 722, 727 (N.D.Ala.1981).

Plaintiff asserts that several practices by B & GCA demonstrate its control over Greater Lee County B & GC's labor relations. B & GCA publishes a list of Executive Director vacancies and provides a list of qualified candidates to member organizations on request.[5] Prior to accepting the position with Greater Lee County B & GC, Plaintiff served as Executive Director of the Boys and Girls Club of Phenix–Russell, Alabama. After board members from the Greater Lee County B & GC contacted her, Ms. Walker spoke with Bobby Smith. He asked that she send him a resume. Plaintiff's Dep. at 28. Additionally, B & GCA provides generic forms setting forth job descriptions and performance reviews which member organizations may obtain. *See* Smith Dep. at 71, 122. Plaintiff also cites the provision of funds through B & GCA to Greater Lee County B & GC and the services offered by Bobby Smith as evidence of centralized control over labor relations.

Plaintiff's submissions do not demonstrate that B & GCA exercised active control over Greater Lee County B & GC's day-to-day labor practices. First, the mere provision of insurance and pension benefits, or other benefit programs, does not establish central control of labor relations. *See Fike v. Gold Kist, Inc.,* 514 F.Supp. 722, 727 (N.D.Ala.1981) (citing *Los Angeles Newspaper Guild, Local 69,* 185 NLRB 303 (1970), aff'd, 443 F.2d 1173 (9th Cir.1971)). Nor does the publication of job vacancies or the provision of model job

---

5. Defendants contend that Greater Lee County B & GC did not obtain Plaintiff's name through this service. *See* J. Walker Dep. at 14; Sankey Dep. at 52–53. Jane Walker testi-

fied that Plaintiff contacted her about the position after the deadline for submitting resumes had passed. J. Walker Dep. at 14.

descriptions and performance review charts demonstrate centralized control. In *Webb*, the American National Red Cross published job vacancies at the local and national level, personnel policies of local chapters had to meet the national organization's regulations, and the national organization could request that chapter members serve elsewhere. Yet the district court found that none of those assertions indicated the active control of day-to-day labor relations. *See Webb*, 652 F.Supp. at 921.

The evidence shows that Greater Lee County B & GC operates independently of B & GCA in its labor relations. B & GCA's "Requirements for Membership" states:

> [The member organization's] governing body shall have control of the Club buildings or designated Club rooms of the Clubs it operates; shall have control of the expenditures of any such Club within an established budget; shall have authority to determine policies and establish programs; shall have the sole authority to appoint, to fix the compensation of, to prescribe the duties of and to establish the terms of employment of its Executive Director; and shall have the sole authority (or delegate the authority to its Executive Director) to hire and discharge employees, to fix their compensation and to prescribe their duties. Boys & Girls Clubs of America shall have no authority whatsoever with respect to any such control or authority of any such governing body.

Plaintiff's Exhibit 16, "Requirements for Membership" Art. II, § 4.C. Thus, the Board of Directors of the Greater Lee County B & GC has sole authority over its employees. In addition, Greater Lee County B & GC developed its own personnel policies and procedure manual, *see*

Beebe Dep. at 41–43, and kept its own payroll. Plaintiff's Dep. at 188.

Plaintiff asserts that Bobby Smith's involvement in her termination is sufficient to establish centralized control over labor relations, and thus, "single employer" status. A recent Eleventh Circuit opinion noted that both the "single employer" and "joint employer" theories "concentrate on the degree of control an entity has over the adverse employment decision on which the Title VII suit is based." *Llampallas v. Mini–Circuits, Lab., Inc.*, 163 F.3d 1236, 1244 (11th Cir.1998). The critical question is, "[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?" *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir.1983).

Bobby Smith was present at the meeting when the Executive Committee of the Greater Lee County B & GC Board of Directors voted to terminate Ms. Walker's employment. *See* Plaintiff's Exhibit 15, Jan. 6, 1997 Field Report. A member of the board had requested Mr. Smith's presence at the meeting as a consultant. *See* Smith Dep. at 76. Mr. Smith noted in his field report that he "[r]ecommended that the termination of the Executive should be based on performance measured against performance standards with appropriate documentation." Plaintiff's Exhibit 15, Jan. 6, 1997 Field Report.[6] The Executive Committee of the Greater Lee County B & GC Board of Directors voted unanimously to terminate Ms. Walker's employment. Smith Aff. ¶ 11.

Even drawing the inference that Mr. Smith played a more active role in Plaintiff's termination than he claims, Ms. Walker cannot establish that B & GCA exercised control over the adverse employment decision or made the final decision regarding her termination. The relevant

---

6. Mr. Smith says that he cautioned the board members that any consultation he provided was only advice that the Board could choose to accept or disregard. He told the Committee that it should act in the best interest of the kids, and make a decision based on the Director's performance, not her personality. Smith Aff. ¶ 11. A member of the Executive Committee testified that Mr. Smith advised them to make the best decision for the boys and girls that attended the clubs. Sankey Dep. at 52.

standard is *control*, not mere involvement. The Greater Lee County B & GC Board of Directors had sole authority to make the decision terminating Ms. Walker's employment. Bobby Smith could have lobbied for the decision, but he could not exercise the authority of the Board of Directors. Greater Lee County B & GC exercised control over the adverse employment action. Ms. Walker has not shown centralized control over labor relations.

### 3. Common Management

There is no evidence of common management between the two entities. Greater Lee County B & GC is governed by a board of directors comprised of volunteer members from the local community. Plaintiff's Dep. at 32–34. It is undisputed that there are no common employees or officers between B & GCA and the Greater Lee County B & GC. Plaintiff's Dep. at 187; Smith Aff. ¶ 4.

### 4. Common Ownership or Financial Control

B & GCA does not have an ownership interest in the Greater Lee County B & GC. Smith Aff. ¶ 4. As for financial control, Plaintiff has submitted evidence that Greater Lee County B & GC pays membership dues to B & GCA, and that B & GCA provided funds to Greater Lee County B & GC in the form of pass-through grant money and contributions to Plaintiff's pension. This evidence does not demonstrate that B & GCA exerted financial control over the member organization. As noted above, the evidence reflects that Greater Lee County B & GC prepares its own budget, keeps its own payroll, and handles its own financial matters.

In sum, Plaintiff cannot establish that B & GCA and Greater Lee County B & GC were a "single employer" for jurisdictional purposes under Title VII and the ADA.[7] Plaintiff concedes that her direct employer, the Greater Lee County B & GC, does not fall within the statutory definition of "employer" in those statutes. Therefore, this court lacks jurisdiction to hear Plaintiff's claims under Title VII and the ADA.

### B. Plaintiff's Claim Under 42 U.S.C. § 1981

The sole remaining claim is Plaintiff's contention that she was discriminated against on the basis of race in violation of 42 U.S.C. § 1981.

A court uses the same requirements of proof and the analytical framework developed in Title VII cases when assessing claims under section 1981. *See* *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998). A plaintiff may establish a claim for violation of Title VII or section 1981 by use of either direct or circumstantial evidence of discriminatory intent.

Where, as here, the plaintiff seeks to prove intentional discrimination on the basis of race by using circumstantial evidence of intent, the court applies the framework first set out by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, the plaintiff must establish

---

**7.** Were the court to apply the stricter standard for aggregation of employees of multiple governmental entities, set forth in *Lyes*, the result would be the same. There is no evidence that B & GCA was structured with the purpose of evading the reach of federal employment discrimination law, nor is the presumption against aggregation clearly outweighed by factors manifestly indicating that the entities are so closely interrelated with respect to control of the fundamental aspects of the employment relationship that they should be counted together under Title VII.

Similarly, the evidence is insufficient to establish the appropriateness of aggregation under the "joint employer" or "agency" theories for liability. B & GCA did not retain for itself sufficient control of the terms and conditions of employment of the employees who are employed by Greater Lee County B & GC, nor did Greater Lee County B & GC delegate sufficient control of some traditional rights over employees to B & GCA.

a prima facie case of discrimination. *Id.* at 802, 93 S.Ct. 1817. After the plaintiff has established a prima facie case of discrimination, the burden of production is placed upon the employer to articulate a legitimate nondiscriminatory reason for its employment action. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

The plaintiff then has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir.1997). The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089; *Combs,* 106 F.3d at 1534.

■ In *McDonnell Douglas,* the Supreme Court set forth four elements of a plaintiff's prima facie case. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824, 93 S.Ct. 1817. Application of the McDonnell factors varies with the circumstances of each case. The Eleventh Circuit has stated that, in the context of wrongful discharge, the factors are as follows: The plaintiff must establish that (1) she is a member of a protected class; (2) she was qualified for the job; (3) she was discharged; and (4) she was replaced by a member outside the protected class. *See, e.g., Noble v. ADEM,* 872 F.2d 361, 365 n. 3 (11th Cir.1989); *Lincoln v. Board of Regents of the Univ. System of Georgia,* 697 F.2d 928, 937 (11th Cir.1983).

Defendants do not contest the first three factors. They assert that Plaintiff was replaced by an African–American, and thus she cannot establish the fourth factor. It is undisputed that Wanda Lewis, an African–American, replaced Plaintiff as Executive Director for the Greater Lee County B & GC. *See* Plaintiff's Dep. at 205. Plaintiff contends, however, that Ms. Lewis did not begin her employment until nine months after Plaintiff filed an EEOC charge. Furthermore, Ms. Walker cites Eleventh Circuit precedent stressing that the methodology outlined in *McDonnell Douglas* is not subject to rigid application and envisions a flexible approach. *See, e.g., Carter v. City of Miami,* 870 F.2d 578, 583 n. 12 (11th Cir.1989). Even assuming that Ms. Walker's replacement by an African–American is not fatal to her prima facie case, the Plaintiff must make some showing at this first stage sufficient to create an inference of intentional discrimination against her on the basis of race. *See Holifield v. Reno,* 115 F.3d 1555,1563 (11th Cir.1997).

Plaintiff offers statements from two Greater Lee County B & GC board members as evidence of racial discrimination. Shortly after Ms. Walker began her employment, Executive Board member Brett Beebe, who was a member of the Board of Directors that hired the Plaintiff, made the comment that "he guessed that the blacks were happy now that a black was in the office." Plaintiff's Aff. ¶ 14; Plaintiff's Dep. at 28–29, 103. Tommy Palmer, who was Board President when Plaintiff began her employment but was not a member of the Board of Directors when the Executive Committee voted to terminate Plaintiff's employment, commented that "blacks love to run their mouth and they need to put their money where their mouth [is]." Plaintiff's Aff. ¶ 14; Plaintiff's Dep. at 104–07. Plaintiff also contends that she had difficulties giving input to the board and often felt that she was simply there for African–Americans to see her. *See id.* According to Ms. Walker, Brett Beebe interjected himself into hiring decisions and wanted to hire people that he knew, including replacing Ms. Walker's secretary with someone who worked for his mother's job agency. *See id.*

■ This evidence simply is insufficient to establish a prima facie case. The statements attributed to the two board members, both of whom were members of the Board of Directors that hired the Plaintiff, have no relation to Plaintiff's termination and do not support an inference that the Greater Lee County B & GC terminated Plaintiff because of her race. While Plaintiff felt that she was discriminated against, her opinion, without more, is not enough to establish a prima facie case of race discrimination. *See Holifield v. Reno*, 115 F.3d 1555,1564 (11th Cir.1997).

Additionally, the Executive Committee which voted unanimously to terminate Plaintiff's employment included African–American members. *See* Smith Aff. ¶ 11, Sankey Aff. ¶ 1. Larry Sankey, an African–American Executive Committee member, made the proposal to terminate Ms. Walker's employment. Sankey Aff. ¶ 9. He contends that Ms. Walker's employment was terminated due to her incompetence and not her race. *Id.* ¶ 8. As Plaintiff notes, an organization cannot shield itself from liability simply by placing members of a protected class in decision-making positions. *See Billingsley v. Jefferson County*, 953 F.2d 1351, 1353 (11th Cir.1992). It is, however, "extremely difficult for a plaintiff to establish discrimination where the allegedly discriminatory decision-makers are within the same protected class as the plaintiff." *Welch v. Delta Air Lines*, 978 F.Supp. 1133, 1153 (N.D.Ga.1997) (citing *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1471 (11th Cir.1991)).

Considering the circumstances of Ms. Walker's termination, the statements of two board members, made far before the events leading to the termination decision, cannot establish a prima facie case. Because this court concludes that Plaintiff failed to present a prima facie case of discrimination on the basis of race, the court need not examine Defendant's articulated legitimate reasons for discharging her, nor determine whether those reasons were merely a pretext for discrimination. *See, e.g., Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1324 n. 16 (11th Cir.1998).[8]

## V. CONCLUSION

For the reasons stated above, the Motion for Summary Judgment filed by Defendant Boys and Girls Clubs of America, Inc. and the Motion for Summary Judgment filed by Defendant Boys and Girls Club of Greater Lee County, Inc. are due to be GRANTED. A separate Order and Judgment will be entered in accordance with this Memorandum Opinion.

**8.** In a letter sent to the Plaintiff, Greater Lee County B & GC set forth the following six reasons for Ms. Walker's termination: (1) Failure to provide consistent and orderly management of the clubs; (2) Failure to provide necessary skilled management and leadership of the staff; (3) Failure to follow programs advocated by the national boys and girls clubs; (4) Failure to perform administrative duties and office details and to prepare necessary reports and requests in a timely manner; (5) Failure to cooperate with members of the Board of Directors and to be present at scheduled meetings with the Board and committees, or on time; and (6) Lack of cooperation with outside institutions and persons willing to help in attaining club goals. Ms. Walker asserts that these reasons were not legitimate, and that she can rebut the articulated reasons by showing inconsistencies in the Defendant's positions. As noted above, however, Plaintiff must first make some showing sufficient to allow an inference of intentional discrimination. Ms. Walker has not done so, and the court declines to proceed to the latter two stages of the analytical framework.